969 So.2d 294 (2007)
Jonathan Huey LAWRENCE, Appellant,
v.
STATE of Florida, Appellee.
Jonathan Huey Lawrence, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC06-352, SC06-1152.
Supreme Court of Florida.
November 1, 2007.
*297 Michael P. Reiter, Venice, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Jonathan Huey Lawrence appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

I. FACTS
On direct appeal, this Court summarized the underlying facts as follows:
On March 24, 2000, Lawrence pled guilty to principal to first-degree murder of Jennifer Robinson, conspiracy to commit first-degree murder, giving alcoholic beverages to a person under twenty-one, and abuse of a dead human corpse. Lawrence's codefendant, Jeremiah Martel Rodgers, picked up eighteen-year-old Jennifer Robinson from her mother's home on May 7, 1998. Rodgers and Robinson met Lawrence, and all three drove in Lawrence's truck to a secluded area in the woods. After imbibing alcoholic beverages, Robinson had sex with Rodgers and then with Lawrence. At some point thereafter, Rodgers shot Robinson in the back of the head using Lawrence's Lorcin .380 handgun. The gunshot rendered Robinson instantly unconscious, and she died minutes later. Lawrence and Rodgers loaded Robinson's body into Lawrence's truck and drove further into the woods. Lawrence made an incision into Robinson's leg and removed her calf muscle. Rodgers took Polaroid pictures of the body, including a picture of Lawrence's hand holding Robinson's foot. Lawrence and Rodgers buried Robinson at that site.
Investigators traced Robinson's disappearance to Lawrence and Rodgers. When confronted by Investigator Todd Hand, Lawrence denied knowing Robinson and consented to Hand's request to search Lawrence's trailer and truck. After recovering multiple notes written by Lawrence and Polaroid photographs depicting Robinson post-mortem, Hand arrested Lawrence. One page of the recovered notes states in part: "get her very drunk," "yell in her ears to check consicouse [sic]," "even slap hard," *298 "[r]ape many, many, many times," "`slice and dice,' [d]isect [sic] completely," "bag up eatabile [sic] meats," and "bag remains and bury and burn." Another page of notes provides a list of items and tasks, some of which had been checked off or scribbled out. That list includes "coolers of ice = for new meat," strawberry wine, everclear alcohol, scalpels, Polaroid film, and ".380 or-and bowies [knives]." Other items located by investigators during their search of Lawrence's trailer and truck included a box for a Lorcin .380 handgun; empty Polaroid film packages; a piece of human tissue in Lawrence's freezer; a blue and white ice chest; an empty plastic ice bag; disposable gloves; a scrapbook; and several books, including an anatomy book entitled The Incredible Machine, within which had been marked female anatomy pages and pen lines drawn at the calf section of a leg. Lawrence subsequently confessed to his involvement, after waiving his Miranda rights [see Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)], and led detectives to Robinson's body.
Lawrence v. State, 846 So.2d 440, 442-43 (Fla.2003) (footnotes omitted). At Lawrence's penalty phase before a jury, the State submitted evidence pertaining to two aggravators: (1) Lawrence committed two prior violent crimes shortly before Robinson's murder;[1] and (2) the murder was committed in a cold, calculated, and premeditated manner (CCP). Id. at 443-44. The State introduced Lawrence's tape-recorded confessions to the Robinson murder and the Livingston murder. Lawrence presented evidence relating to numerous mitigating circumstances by calling witnesses who testified about Lawrence's disturbed childhood and his limited mental capacity. Id. at 444. He also presented three expert witnesses who testified that Lawrence had organic brain damage and schizophrenia. Two of the experts testified that both statutory mental mitigators applied and that Lawrence could be considered a follower. Id. The jury recommended death by a vote of eleven to one. A Spencer[2] hearing was held.[3] The trial court found two aggravating circumstances,[4] five statutory mitigating circumstances,[5] and four nonstatutory *299 mitigating circumstances.[6]Id. at 445. After weighing these factors and considering the jury's recommendation, the trial court sentenced Lawrence to death. On direct appeal, Lawrence raised seven claims.[7] This Court held that Lawrence failed to establish any prejudicial errors and affirmed the sentence of death. See Lawrence, 846 So.2d at 441.
Lawrence filed a timely motion for postconviction relief with the trial court, raising eight claims: (1) his constitutional rights were violated because his guilty plea was not knowing and voluntary; (2) his convictions and death sentence are unreliable because no adversarial testing occurred during the pretrial and guilt-phase proceedings due to the ineffective assistance of his counsel; (3) his sentence is unreliable because inadequate testing occurred during the penalty phase due to ineffective assistance of counsel; (4) the Florida death penalty sentencing statute is unconstitutional as applied; (5) Lawrence's constitutional rights were violated because he was denied the opportunity to interview jurors; (6) execution by electrocution or lethal injection is cruel or unusual punishment; (7) Lawrence may be incompetent at the time of execution; and (8) the cumulative effect of the procedural and substantive errors deprived Lawrence of a fundamentally fair trial. He later amended his motion, raising the additional claim that counsel was ineffective for failing to request a competency hearing during the penalty phase.
During an evidentiary hearing, Lawrence presented numerous witnesses, including five expert witnesses: Dr. Frank Wood, Dr. Robert Napier, Dr. Barry Crown, Dr. James Larson, and Dr. Lawrence Gilgun. Each of the experts testified as to their testing of the defendant and Lawrence's mental deficiencies. Drs. Larson and Gilgun asserted that Lawrence showed evidence of malingering on their tests, while Dr. Crown asserted that he tested Lawrence for malingering and found no evidence of this. The experts had differing opinions as to whether Lawrence may have been incompetent at the time of the penalty phase.
Lawrence presented the testimony of both his sister and his mother, who testified as to the circumstances of the plea and the statements discussed by the attorneys when the attorneys recommended that Lawrence plead guilty. Lawrence's trial counsel, Elton Killam and Antoinette Stitt, also testified. Both Killam and Stitt had extensive prior criminal experience. Killam testified as to numerous decisions that he had made in reference to his representation of Lawrence. Killam was questioned at length regarding Lawrence's competency. After reviewing Dr. Larson's report, which was made early in the proceedings, Killam did not believe that Lawrence was incompetent, and Killam did not see any deterioration in Lawrence's mental *300 faculties during the time of his representation. Although Lawrence complained about experiencing hallucinations twice during the penalty phase, Killam thought that Lawrence was having a "bout with his conscience." Based on the evidence as it existed, Killam firmly believed that Lawrence's best chance to avoid the death penalty was that Lawrence plead guilty to being a principal and then for counsel to direct the jury's focus toward the substantial mitigation showing that Lawrence's brain was dysfunctional and that Lawrence was under the influence of his codefendant, Rodgers, at the time of the crime. Co-counsel Stitt, on the other hand, had concerns as to Lawrence's competency throughout her representation of Lawrence. However, while she had her own personal concerns, two experts found Lawrence competent. In hindsight, Stitt would have requested a competency hearing after Lawrence complained of hallucinations; at the time, though, she chose not to after consulting with Killam, who believed Lawrence was simply upset by the evidence.
Lawrence called the trial judge as a witness, who appeared telephonically. The trial judge stated that if counsel had made a good-faith representation that Lawrence was having competency issues during the trial, he would have permitted an evaluation, but there was nothing different about Lawrence's behavior that raised any of these concerns. Lawrence called Lieutenant Todd Hand,[8] who testified about Lawrence's behavior after he was arrested and Lawrence's numerous recorded statements. Finally, Lawrence testified as to his counsel's advice about pleading guilty, his memories of the initial arrest, his discussions with Lieutenant Hand, and his understanding of the plea, along with other matters involving the case.
After the defense rested, the State called Michelle Heldmyer, who was the lead prosecutor in the federal case involving Livingston's murder. The State also called Deputy Jarvis, who spent time with Lawrence shortly after Lawrence reported having hallucinations. According to Deputy Jarvis, when he asked Lawrence why he was upset, Lawrence replied that he did not want to hear his taped confession because it made it seem like the crime was happening all over again. After the postconviction court heard all of the testimony and considered the parties' written arguments, it denied relief in a lengthy and detailed order. Lawrence appeals this decision.

II. ANALYSIS
On appeal, Lawrence raises the same claims that he raised to the postconviction court and challenges the postconviction court's finding that counsel was not ineffective for failing to request a competency evaluation during the penalty phase. He also filed a petition for a writ of habeas corpus. We find that four of these claims warrant discussion.[9]

*301 A. Whether the Guilty Plea Was Knowing and Voluntary
Lawrence first asserts that the court below erred in denying his claim that his plea was not voluntary because: (1) Lawrence did not understand the consequences of his plea due to his mental illness and misrepresentation by his trial counsel; (2) Lawrence did not understand many of the substantive words used during the plea due to his mental illness and his low intelligence; and (3) based on Lawrence's mental illness and trial counsel's actions, the trial court's inquiry was insufficient to discover that Lawrence's plea was involuntary.
At the postconviction evidentiary hearing, conflicting testimony was presented as to Lawrence's competency at the time of his decision to plead guilty. In a very detailed order, the trial court resolved the conflicting evidence and denied this claim as follows:
It is clear that a plea of guilty must be voluntarily made by one competent to know the consequences of that plea and must not be induced by promises, threats or coercion. The defendant has the burden of presenting substantial evidence establishing incompetence at the time of the plea. A defendant's competency at the time he enters a guilty or no contest plea is an issue bearing upon the voluntary and intelligent character of the defendant's plea.
It is clear from the record that the Defendant suffers from a mental illness as evidenced by the testimony of several neurology/psychology experts. This coupled with the Court's observation of the Defendant as one who is quiet, silently withdrawn, exhibiting no outward reaction to these proceedings is indicative of the experts' characterization of various symptoms of his diagnosed illness. However, the Defendant's mental illness is not disputed; the tension exists in whether his mental illness interfered with his ability to enter a knowing and voluntary plea. See generally Muhammad v. State, 494 So.2d 969, 973 (Fla. 1986) (stating "one need not be mentally healthy to be competent to stand trial")[.]

*302 Dr. Wood testified that the Defendant is schizophrenic and stated Defendant's statement that he was hallucinating provided a sufficient basis for him to render an opinion based on his knowledge of the psychosis that the Defendant was not competent at the time of the plea. However, Dr. Wood qualified his opinion and stated he did not examine the Defendant for competency and that his opinion is generic. As such, the Court is of the opinion that Dr. Wood's generic opinion today is insufficient to establish that the Defendant, Jonathan Lawrence, not a pseudo individual diagnosed with a similar psychosis, was incompetent at the time of his plea.
Similarly Dr. Napier testified that he did not interview the Defendant during or around the time of his guilty plea thus he could not have advised trial counsel of the Defendant's comprehension at that time. Dr. Napier's testimony concerning the Defendant's comprehension ability during the 2000 proceeding is based on a 1996 evaluation, which is several years prior to his competency evaluation in 1998 and the entry of his plea agreement. In fact, Dr. Napier testified that he was unable to give a formal opinion because he did not do an evaluation and his opinion is based on past history and behaviors and indicated there was "the possibility of not being competent." It follows and this Court finds that Dr. Napier's opinion of Defendant's ability to comprehend the proceedings based on his evaluation in 1996 is insufficient to support the theory that the Defendant was incompetent at the time of this plea.
Lastly, Dr. Crown testified that he evaluated the Defendant in 1998 and found that the Defendant had significant language based critical thinking problems and neuropsychological impairments, which in his opinion would render the Defendant incompetent at the time of his plea in March 2000. The Court finds that Dr. Crown's testimony is insufficient to establish that the plea was involuntary especially when buttressed against the weight of the evidence found in the record and produced during the evidentiary hearing which supports a finding that the Defendant's plea was indeed voluntary and knowingly entered.
The Court finds and it is clear from the record that every effort was taken on the part of the trial court and the defense attorneys to ensure that the Defendant was cognizant of the proceedings and understood the ramifications of his decision in light of his mental illness. For instance, competency evaluations were conducted in October 1998 by Drs. Bingham and Larson wherein the Defendant was found to be legally competent to proceed. Furthermore, Mr. Killam testified that during his representation he did not observe any degeneration of the defendant's ability to communicate, instead "he seemed as he was described to me." In addition, Mr. Killam testified that the Defendant was a good listener and comprehended what was being discussed and he had the impression that Defendant was "capable of sitting through a trial, and conducting himself properly, and making decisions." Similarly, Ms. Stitt testified that she had two reports finding the Defendant competent and during the course of the representation his behavior "remained pretty consistent" thus not prompting her to feel the Defendant needed another competency evaluation. The Court finds trial counsel's testimony to be credible considering it was trial counsel who had repeated contact with the Defendant over *303 a 22 month period and was in the position to notice if there was a deterioration of the Defendant's mental state. As such, the Court finds the Defendant has failed to establish that his mental illness effected his ability to understand the proceedings and the consequences of his actions in light of the fact the testimony revealed there was no change in the Defendant's ability to communicate and comprehend the proceeding from the time of the original finding of competence and the entry of his plea.
Moreover, the evidence is clear that trial counsel made no misrepresentations or promises to the Defendant regarding the sentence that he would receive if the Defendant pled guilty. For example, Mr. Killam testified that he did not promise a life sentence if the Defendant pled guilty nor was there a plea bargain from the State offering a life sentence in exchange for pleading guilty. Instead after a review of the evidence indicating the Defendant's guilt, a strategic decision was made to plead in the hopes that a presentation of the mitigating evidence would garner a life sentence. Likewise, Ms. Stitt testified that she never told Ms. Thompson that if the Defendant pled guilty they would save his life. Furthermore, Ms. Thompson testified that she had no specific recollection of being told by trial counsel that the State had offered life imprisonment in exchange for a plea and Ms. Carter testified that trial counsel never told her that there was an arranged benefit with the State that in exchange for a plea of guilty there would be a recommendation for a life sentence. Thus, the Court finds that the Defendant has not established that his mental illness coupled with the actions of counsel resulted in the Defendant not understanding the plea process or the consequences of his plea.
Additionally, the Defendant argues that due to his mental illness he was unable to understand the substantive terms used by the State and trial court. Mr. Killam testified that prior to the videotape conference there had been discussions about the plea process. Though Ms. Stitt had concerns about the Defendant's mental state, Ms. Stitt in her professional opinion coupled with repeated discussions and interaction with the Defendant over a 22 month period felt that he understood the process. Words such as "confederated" "due process" "combined" "principal" "aider" "abettor" were explained to the Defendant. Bearing in mind that the Defendant had a mental illness, counsel with the permission of the Defendant talked with the Defendant's [m]other Iona Thompson about the strategy of pleading and had Mrs. Thompson also explain the process because they felt "perhaps she would be the one who could better communicate with Jonathan"; that she would be able to say things in a way that the Defendant could understand his position. Thus, the Court finds the Defendant has not established that his plea was not voluntary or knowing based on this sub-claim.
In terms of whether the trial court was prevented by trial counsel's actions to discover that the plea was not voluntary and knowing, the record reveals that the trial court conducted an extensive plea colloquy wherein the trial court repeatedly questioned the Defendant as to the circumstances of the plea and whether the plea was actually the Defendant's decision. Notably on the issue of voluntariness, the Court inquired on two (2) occasions whether there was any form of coercion or promises. The questions were asked with a lapse of subject matter and posed in a different *304 form. . . . Furthermore, the Court repetitively inquired of the Defendant with questions differing in form whether the decision to plead was his. . . . Similarly, the trial court repeatedly sought affirmation that the Defendant was aware that by pleading guilty that the only determination to be made would be whether he would be sentenced to death or given a life sentence without the possibility of parole. . . . With this in mind, the Court finds that the evidence is clear that trial counsel's actions did not prohibit the trial judge from determining whether the plea was voluntary and knowing considering the record is replete with the trial court's concern with the Defendant's predisposition of being a follower. As illustrated above and throughout the plea colloquy, the trial court considered the Defendant's mental limitations and the concern was exhibited throughout the plea colloquy in the manner in which the questions were asked, rephrased, and addressed repeatedly to ensure the Defendant truly understood the nature of his plea and that the decision to plea [sic] was ultimately his decision. Any inference that the Defendant was given a set of questions to memorize in order to have the proper response is negated.
Consequently, the Court finds that the Defendant's guilty pleas to all four counts . . . were entered into knowingly and voluntarily. The Defendant has failed to establish that his mental illness coupled with the alleged actions of counsel prohibited the Defendant from understanding the process or the consequences of his plea. The record reveals that the trial court explained that the Defendant was entitled to a jury determination of guilt, that the only sentencing options were life or death and the Defendant stated repeatedly that he understood the consequences of the plea, that he was not threatened or coerced and he was not under any medication that would impair his understanding of the decision.
(Citations omitted.)
In order to evaluate this claim in a postconviction setting, a court must answer two questions: "(1) whether the court could make a meaningful retrospective evaluation of the defendant's competence at the time of trial; and, if so, (2) whether the defendant was in fact competent at the time of trial." Jones v. State, 740 So.2d 520, 523 (Fla.1999).[10] Some of the factors to be considered include: the defendant's appreciation of the charges and the range and nature of possible penalties; the ability to assist one's attorney and disclose relevant facts surrounding the alleged offense; the ability to manifest appropriate courtroom behavior; and the capacity to testify relevantly. See id. at 523 (relying upon Fla. R.Crim. P. 3.211(a)(1)).
Lawrence attempts to rely upon Jones for relief, as a case in which this Court addressed whether a defendant was incompetent at the time of his trial. We find that case to be distinguishable. In Jones, the defendant brought a postconviction claim that he was incompetent at the time of his trial, and his competency to stand trial had never been tested. Jones, 740 So.2d at 521. In support, he attached affidavits from attorneys who had represented him during various stages, each of whom asserted that they had concerns as to his competency and who would have *305 requested an evaluation if they had stayed on the case. He further attached affidavits from psychologists who asserted that Jones suffered from organic brain damage. Id. at 522. The postconviction court summarily denied the claim, and this Court reversed and remanded for an evidentiary hearing. After delaying a hearing for twelve years, the court below finally held the required hearing and then denied relief without elaboration. Id. This Court vacated the conviction and sentence, concluding that "the twelve-year delay undisputedly not due to appellant, the lack of psychological testing contemporaneous to trial, and the State's own evidence that a retroactive competency determination is not possible establish the inability to provide appellant a meaningful retrospective competency determination that complies with due process." Id. at 524.
In contrast to Jones, as the postconviction court pointed out, Lawrence was found to be competent by two experts prior to his trial. Neither of Lawrence's trial counsel noticed any deterioration in Lawrence's ability from the time of this finding. Moreover, prior to accepting the plea, the trial judge discussed Lawrence's mental issues with counsel, the defendant, and even the defendant's mother. Counsel and Lawrence's mother both asserted that the plea was Lawrence's decision, and they believed that he was not blindly following counsel's advice by accepting the plea. Moreover, Lawrence's defense counsel, Killam, asserted that he specifically inquired whether Lawrence was having any hallucinations or if there were other problems that would affect his decision to plead guilty, and prior to the plea, Lawrence told him that he had none of these issues. The court then engaged in a lengthy colloquy with Lawrence, repeatedly ensuring that Lawrence understood that the decision to plead was his alone, explaining the plea and its consequences repeatedly, and rephrasing the consequences of his plea including the possibility of receiving the death penalty. The court found that Lawrence freely, voluntarily, and knowingly entered into the plea and that Lawrence's decision to plead guilty was his own, even in light of his limited intellectual ability and mental issues.
Lawrence essentially contests how the postconviction court weighed the evidence presented at the hearing, contending that the court did not give sufficient weight to the evidence which showed the potential effect of Lawrence's mental illness upon his plea and relied too heavily on trial counsel's testimony that they thought he understood the plea process. In conjunction with this claim, Lawrence contends that his reported hallucinations during the penalty phase showed that he was incompetent during the plea and that his trial counsel's concern with how to handle the overwhelming evidence of guilt supports his contention that they pressured him into the plea. Lawrence's arguments involve the weight of the evidence and demonstrate merely that there was conflicting evidence on this issue. As this Court has stated, "Evidence contrary to the circuit court's ruling is outside the scope of the inquiry at this point, for a reviewing court cannot reweigh the `pros and cons' of conflicting evidence." Blackwood v. State, 946 So.2d 960, 973 (Fla. 2006) (quoting State v. Coney, 845 So.2d 120, 133 (Fla.2003)). Instead, a "reviewing court must defer to the circuit court's factual findings as long as those findings are supported by competent, substantial evidence in the record." Id. (quoting Coney, 845 So.2d at 132-33). The postconviction court reviewed this claim in depth, reviewing and weighing all of the expert opinions and relying upon counsel's statements during the plea and during the postconviction *306 evidentiary hearing.[11] Moreover, the postconviction court reviewed the plea colloquy, noting how the original trial judge carefully asked Lawrence numerous questions, rephrased those questions, and addressed the same issues repeatedly to ensure that despite any mental limitations, Lawrence was able to understand the nature of the plea and that he faced a potential sentence of death. In this case, there is competent, substantial evidence to support the postconviction court's factual findings relative to this claim. Further, we find no error as to the postconviction court's conclusions of law. Thus, we deny this claim.

B. Ineffective Assistance of Counsel During the Guilt Phase
In his second claim, Lawrence contends that the trial court erred in denying his several claims of ineffective assistance of counsel. Lawrence first asserted that his counsel was ineffective for wrongly pressuring him to plead guilty without informing him as to the potential defense theory of a codefendant's independent act; making misrepresentations that if he went to trial, he would be sentenced to death; and asserting that if he did not plead guilty, the trial would consist of gory photograph after gory photograph and witness after witness. The postconviction court denied these claims as follows:
This Court has previously addressed the Defendant's contention of misrepresentation in Claim I and found neither trial counsel made any misrepresentations. The testimony revealed that no promises for a life sentence were made. . . . As such, the Court finds the claim of misrepresentation to be without merit.
Moreover, Mr. Killam denied telling the Defendant there was no defense, instead he testified he probably told the Defendant that he did not think they would win at trial, "but I don't think I left him without any hope. I mean, I try not to deal in absolutes." Though Mr. Killam acknowledged that he did not remember whether he discussed the theory of independent act of a co-defendant with the Defendant, counsel testified there was evidence that indicated that the Defendant's claims "he did not kill her, did not participate, he had no knowledge" were false. This contention is reinforced by Ms. Stitt when she testified that the Defendant had admitted that he participated in certain acts that would indicate guilt as a principal. As such, the Court finds that the Defendant has failed to establish that being informed of such a defense would have altered the outcome of the case or would have succeeded at trial. See e.g. Odom v. State, 782 So.2d 510, 512 (Fla. 1st DCA 2001) (citing Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) ("where the alleged error of counsel is a failure to advise of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether *307 the affirmative defense likely would have succeeded at trial")).
(Citations omitted.)
In Lawrence's first subissue on this claim, he asserts that his counsel was ineffective in failing to inform him prior to the plea that a reasonable defense to the crime was to contest whether he was truly a principal to the crime since Lawrence asserted that he did not know his codefendant was going to kill the victim. Lawrence first contends that the court below used the wrong prejudice standard because the court below denied this claim after holding that Lawrence failed to prove that if he had been informed of such a defense, it "would have altered the outcome of the case or would have succeeded at trial." As to this point, Lawrence is correct. The present case involved a guilty plea, so the two-pronged Strickland[12] test for determining ineffective assistance of counsel claims is slightly modified. See Grosvenor v. State, 874 So.2d 1176, 1179 (Fla.2004). Although the first prong of the Strickland test is the same, i.e., deficient performance, in order to show the prejudice prong, a defendant must demonstrate "a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial." Id. (quoting Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). This does not mean that courts refuse to look to the merits of any defense but instead find this factor relevant to "the credibility of the defendant's assertion that he would have insisted on going to trial." Id. at 1181. Accordingly, in determining whether a reasonable probability exists that the defendant would have insisted on going to trial, a court should consider
the totality of the circumstances surrounding the plea, including such factors as whether a particular defense was likely to succeed at trial, the colloquy between the defendant and the trial court at the time of the plea, and the difference between the sentence imposed under the plea and the maximum possible sentence the defendant faced at a trial. As the Supreme Court emphasized in Hill, these predictions "should be made objectively, without regard for the `idiosyncracies of the particular decisionmaker.'"
Grosvenor, 874 So.2d at 1181-82 (quoting Hill, 474 U.S. at 60, 106 S.Ct. 366). The postconviction court, however, did not make a finding on this issue since it focused on the incorrect standard.
Nevertheless, we find that this claim is meritless and does not meet the first prong of Strickland, deficient performance. There is insufficient competent, substantial evidence to support a claim of deficient performance based upon a failure to inform Lawrence of an available defense.
During the evidentiary hearing, Killam could not specifically recall whether he discussed the "independent act of a codefendant" defense with Lawrence. Killam did testify that he considered this defense, but he did not believe it was an effective or substantive defense to the murder in light of the strong evidence demonstrating that Lawrence was aware of the full scope of the plan, including the prior notes Lawrence wrote as to how the murder was to be carried out. Killam testified that he did not think that a jury would believe that Lawrence did not know that his codefendant planned to kill Robinson. Instead, Killam concluded that Lawrence's best chance of obtaining a life sentence would be to present Lawrence as someone who recognized his wrongdoing and was truly *308 remorseful, and then rely upon the significant mitigating evidence, a tactic which was contrary to proceeding to trial. Killam strenuously stressed to his client that he believed pleading guilty would be the best way to avoid the death penalty.
Counsel Stitt testified that her assessment of the case was that Lawrence had "no real defense" that had any likelihood of success before the jury. Stitt could not recall whether she discussed the potential defense of a codefendant's independent act with Lawrence, but she did consider the defense. However, the biggest impediment to this defense was that she thought Lawrence had admitted to participating in certain acts which showed his guilt as principal to the crime. Based on Lawrence's admissions to counsel, this defense was not available, and counsel was not ineffective in failing to inform Lawrence about a defense which would not apply to him. Based upon this evidence, we conclude that Lawrence failed to show that counsel performed deficiently so as to breach the standard for defense counsel as set forth in Strickland.
Furthermore, even if we assume that counsel's performance was deficient in not discussing this defense with Lawrence, Lawrence has not demonstrated "a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial." Grosvenor, 874 So.2d at 1179 (quoting Hill, 474 U.S. at 59, 106 S.Ct. 366). Lawrence failed to present any evidence or testimony that if he had known about this defense, he would not have pled guilty.[13] In fact, the testimony from the evidentiary hearing shows that Lawrence's decision to plead guilty was based on his belief that it would provide a better chance of avoiding the death penalty. During the evidentiary hearing, Lawrence asserted that the reason he did not have a trial was in order to avoid the death penalty. After talking to counsel and his mother, all of whom recommended that he plead guilty, he decided to enter a plea because there was a "good chance" that he would get a life sentence. Accordingly, we deny this portion of the claim.
Lawrence also asserted that his counsel was ineffective because they failed to file a motion to suppress Lawrence's prior statements and failed to file a motion to recuse the trial judge. The trial court denied the claims, finding:
[D]efense counsel's testimony indicates the basis for not filing a motion to suppress was a reasoned professional decision reached after discussion with co-counsel. Ms. Stitt testified that one of the purposes for not filing the motion to suppress was to show the larger culpability of the co-defendant Jeremiah Rodgers because at that point they were unsure whether or not to call the defendant to testify considering his particular problems and felt this would be a sound way to show the Defendant was the lesser participant and under the influence of Jeremiah Rodgers. Therefore, the Court finds the Defendant has not overcome the presumption that the decision not to file a motion to suppress was a strategic decision and this claim is denied as without merit. Moreover, the issue of voluntariness of the statements was raised by the State, evidence was presented on the matter wherein the trial court made the determination that the evidence presented adequately demonstrated *309 the voluntariness of statements. As such, the Court finds the Defendant has failed to establish that but for this omission there is a reasonable probability the result of the proceedings would have been different.
Lastly, the Defendant argues that counsel rendered ineffective assistance in failing to move for disqualification of the trial judge after some comments were made regarding the Defendant's previous statements to law enforcement. The Court finds that the Defendant has failed to establish that counsel's performance was deficient especially in light of the fact Ms. Stitt testified that a motion to disqualify was discussed and given the circumstances of this case reasoned that Judge Bell was aware of the Defendant's problems considering he had presided over the Defendant's prior cases and "would be the better of any judge that [they] could get, as far as understanding the problems Jonathan had."
As to both issues, counsel made strategic decisions in deciding not to file the motions. Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct. See Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). Lawrence is not entitled to relief.

C. Ineffective Assistance of Counsel During the Penalty Phase
In his third claim, Lawrence asserts that his trial counsel failed to adequately test the State's case in the penalty phase because: (1) Killam conceded to the jury that the crime was cold, calculated, and premeditated (CCP); (2) he made derogatory comments about Lawrence and his "little brain"; and (3) he did not submit all of Lawrence's other statements to the jury.
As to the CCP claim, Lawrence contends that his attorney conceded this aggravator numerous times and then later contested CCP in his written memorandum to the judge, asserting that this aggravating factor was not established because expert opinion demonstrated that Lawrence lacked the ability to plan such an event on his own. The postconviction court denied this claim, finding that the defendant's characterization of the statements lacked merit and that Killam was asserting that the mitigating circumstances outweighed whatever aggravation was established. The court further found that this was a strategic decision in attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime by making some halfway concessions to the truth to give the appearance of reasonableness and candor to gain credibility with the jury.
In order to prove that counsel was ineffective, Lawrence must show that his counsel's performance was deficient and that he was prejudiced by this deficient performance. This Court defers to the trial court's factual findings so long as they are supported by competent, substantial evidence but reviews the trial court's legal conclusions de novo. See Dillbeck v. State, 882 So.2d 969, 972-73 (Fla.2004). Lawrence is not entitled to relief on this claim because he cannot prove that he was prejudiced by this alleged deficiency. Plainly, the horrendous facts of the victim's murder provide competent, substantial evidence in support of this aggravator. Lawrence wrote down the notes as to how he and Rodgers would accomplish the murder, and then they followed these notes. Lawrence obtained the gun that was used in the crime. He had a book on the human body in which a portion of a leg was circled, the very part of the victim *310 which was cut off and found at Lawrence's home.
Next, Lawrence contends that trial counsel was ineffective because he used derogatory words like "little pea brain" to describe Lawrence. The court below denied this portion of the claim, finding that counsel made these statements in an attempt to show Lawrence's brain was defective and different from an average person'sthat Lawrence was mentally impaired through no fault of his own. The court concluded that "the comments used by the defense counsel was a reasonable trial tactic in order to dramatize and reiterate to the jury that the Defendant suffered a mental illness that was a direct result of brain damage and interfered with his ability to function."
Lawrence contests this ruling, relying upon this Court's decision in State v. Davis, 872 So.2d 250 (Fla.2004), to support his claim of error. In Davis, defense counsel, who was representing an African-American defendant accused of killing a white woman, made numerous comments of racial prejudice during voir dire. This Court granted the defendant a new trial because the prejudice expressed by counsel "so seriously affected the fairness and reliability of the proceedings that our confidence in the jury's verdicts of guilt is undermined." Davis, 872 So.2d at 253. Lawrence acknowledges that Davis addresses only race but contends that this rationale should be extended to apply to the mentally disabled as well. We disagree. Although counsel could have used different terminology, counsel was not making those statements for the purpose of belittling Lawrence but to express that the evidence elicited from the position emission tomography (PET) scan demonstrated that Lawrence had brain damage and diminished Lawrence's moral culpability, which is an extremely relevant consideration. Accordingly, we deny this portion of his claim.
Finally, Lawrence contends that his counsel was ineffective in failing to show the reliability and voluntariness of Lawrence's statements to the police. The postconviction court denied this claim as follows:
During the evidentiary hearing, Mr. Killam testified that he felt the statements went "hand in hand with the domination mitigator" being proffered at the penalty hearing because the statements blamed the co-defendant Jeremiah Rodgers as the reason/motivation for the crimes. The overall theme to be presented to the jury was the fact that the Defendant was a textbook case of mental illness "accompanied by a satanic domination, a Manson like person." Thus, it would have been contrary to the overall theme to contest the reliability of the statements wherein the statements were used to show "follower" relationship. As such, the Court finds the strategic decisions employed by defense counsels did not render their performance ineffective, thus this claim is denied.
(Citations omitted.) Lawrence contends that the court below interpreted his claim too narrowly and alleges that his counsel should have admitted more of the statements because they showed a complete picture of Lawrence, including his inability to remember, that he did not shoot the victim in this case and did not shoot the victim in the Smitherman case, and that Lawrence did not kill Livingston.
First, Lawrence never raised below the claim that counsel was ineffective in failing to submit all of the confessions. Instead, at the court below, postconviction counsel asserted that counsel should have presented expert testimony to establish that when he gave his statements to the police, Lawrence did not understand his rights, did *311 not understand the questions, did not understand the consequences of his answers, and was merely trying to please his interrogators, issues which are not raised here. His modified claim is procedurally barred. See Armstrong v. State, 862 So.2d 705, 713 (Fla.2003) ("This Court will only review those claims actually presented to the court below and thus will not consider the modified versions of these claims under ineffective assistance analysis."). To the extent that this claim is not procedurally barred, Lawrence has failed to establish any basis for granting relief as to this claim.

D. Ineffective Assistance in Failing to Request a Competency Hearing
In his final postconviction claim, Lawrence alleges that the postconviction court erred in denying his claim that his counsel was ineffective in failing to request a competency hearing during the penalty phase after Lawrence told his counsel that he was suffering hallucinations. In reviewing this claim, it is important to first review the record from the original trial. Specifically, while Janice Johnson, a crime scene analyst, was testifying about the pictures from the crime scene, defense counsel requested a bench conference and informed the court that Lawrence was reporting that he had "hallucinations and flashbacks." The judge excused the jury, and Stitt elaborated that while the State's witness was discussing the crime scene, Lawrence began to have "not only visual but auditory hallucinations and flashbacks." The judge granted the defense's request for a break, and after the parties returned, the judge inquired whether Lawrence was better. Lawrence replied that he was fine. After counsel was satisfied that Lawrence was ready to proceed, the jury was brought back in.
Shortly thereafter, Lawrence's tape-recorded statement pertaining to the Livingston murder was introduced. During the playing of the statement, Stitt indicated to the court that Lawrence was having a problem, and a bench conference was called. Stitt informed the court that Lawrence indicated that he was "beginning to hallucinate again" and wanted to be excused for the playing of the tapes. After the jury was temporarily excused, the court questioned Lawrence about whether he understood that he had a constitutional right to be present during the entire trial and asked him whether he wanted to be excused during the playing of his prior statements. Lawrence stated that he understood and wanted to be excused. The court then clarified:
THE COURT: And your counsel has used the word "hallucination," but what we are actually talking about is flashbacks, remembering what happened?
THE DEFENDANT: Yes.
THE COURT: Is that what is bothering you?
THE DEFENDANT: Yes, sir. It is bothering me pretty bad.
The court ensured that his counsel had discussed the matter with Lawrence and then inquired whether Lawrence desired to be absent for the playing of the tape related to Livingston or if he also wished to be absent during the tape involving the Robinson murder. Lawrence and his counsel stated that he wished to be absent for both. The court then asked the State whether it wished to ask Lawrence any questions. After an off-the-record discussion, the State responded, "The State does not have an objection if it is an issue of discomfort rather than competency, and Ms. Stitt and Mr. Killam assure me that it is." The judge then stated that he needed to clarify for the record and distinguish between hallucinations and flashbacks or remembering the event. He asked counsel to talk with their client, which they did. *312 At that point, the following discussion took place:
THE COURT: . . . Describe to me what is going on.
THE DEFENDANT: Mainly rather not be here when they hear, I guess my own voice on there.
MS. STITT: Tell me what you told me about it being the voice of your brother.
THE DEFENDANT: I'd just rather not hear it.
MS. STITT: Just a minute ago you told me that you were hearing the voice of your brother, your dead brother.
THE DEFENDANT: That's what the tape sounds like. And I just don't want to hear it.
MS. STITT: And did you say anything to me about having visual hallucinations?
THE DEFENDANT: When I was back out in the field and I don't want to be out there.
THE COURT: So what you are remembering is actually the event?
THE DEFENDANT: Yes.
THE COURT: What happened that night?
THE DEFENDANT: Yes.
THE COURT: As you are listening to your voice and it is being played you are reliving it in your mind, is that what you are talking about?
THE DEFENDANT: Yes.
THE COURT: But is it a true picture in your mind of what happened, is it just like a replay?
THE DEFENDANT: Yes, sir. It isit makes me real nervous and makes me sweat real bad.
THE COURT: But you are not hearing other people's voices or things that are not replaying? I am trying to distinguish between your replaying in your mind what happened in the past as opposed to real strange things going on?
THE DEFENDANT: I can't really explain it.
THE COURT: Is it a replay of what happened? Is that what is troubling you or are you hearing other voices or
THE DEFENDANT: I don't know for sure.
THE COURT: Only you can tell me.
THE DEFENDANT: I'm not real sure what to think, I guess that I could go sit back down or something
MS. STITT: You just want to be excused?
THE DEFENDANT: Yes, ma'am.
MS. STITT: Okay.
THE COURT: And it's because you are uncomfortable hearing yourself describe what happened, is that the reason?
THE DEFENDANT: Yes.
THE COURT: Is there any other reason other than you are just uncomfortable listening to yourself describe, describe what you did, is that the reason?
THE DEFENDANT: (Nods head affirmative) I think so.
The trial court then found that Lawrence freely, voluntarily, and knowingly waived his right to be present during the tapes, and the trial resumed. Again the next day, prior to the second statement being played, the judge again inquired as to how Lawrence was doing and asked if he was hearing any noises or anything in his head. Lawrence replied that he was not. The court asked him why he wanted to be excused, to which Lawrence replied, "I guess I just have a hard time hearing myself talk." Stitt asserted that she thought this was in their client's best interest. The judge permitted Lawrence to *313 leave during the playing of the second statement.
On direct appeal, Lawrence asserted that the trial judge erred because he failed to order a competency hearing after he learned about Lawrence's hallucinations. After noting that no competency hearing was requested, this Court denied the claim, particularly in light of the fact that defense counsel informed the trial court that some time before, Lawrence had been found competent to proceed, and they thought he was still competent to proceed. Of further importance to this Court was the fact that the trial court engaged in a lengthy colloquy with Lawrence and, based on his responses, found that "Lawrence was simply uncomfortable hearing certain portions of the evidence." Lawrence, 846 So.2d at 448. Accordingly, this Court denied the claim that the trial court abused its discretion in proceeding with the penalty phase without first ordering a competency hearing. Id.
The State contends that because Lawrence already challenged the failure to hold a competency hearing, Lawrence's current claim is procedurally barred. We disagree. The only question that this Court faced on direct appeal was whether the trial court erred in failing to sua sponte order a competency evaluation. This is an entirely different legal question than whether defense counsel should have requested the hearing. Defense counsel has a different obligation to their client than the judge and has a much broader base of knowledge upon which to rely in determining whether a defendant may be incompetent. In this case, it is clear that in making his decision, the trial judge relied significantly upon counsel's representations and counsel's discussion with Lawrence as to whether Lawrence was truly experiencing hallucinations or flashbacks. In order to resolve such a claim, this Court would need evidence pertaining to what Lawrence's counsel knew, including what they learned from their mental health experts, whether Lawrence's behavior changed during their representation, conversations counsel had with their client, and numerous other factors which would not be apparent on the face of the record at that time. Accordingly, Lawrence could not have raised his current ineffective assistance of counsel claim on direct appeal. See, e.g., Bruno v. State, 807 So.2d 55, 63 n. 14 (Fla.2001) ("A claim of ineffectiveness can properly be raised on direct appeal only if the record on its face demonstrates ineffectiveness."); Desire v. State, 928 So.2d 1256, 1257 (Fla. 3d DCA 2006) ("As a general rule, claims of ineffective assistance of counsel are not ordinarily cognizable on direct appeal. The exception is when the error is apparent on the face of the record, which is rarely the case.")
In turning to the merits of this case, the postconviction court denied this claim as follows:
In the instant case, Mr. Killam testified that based on his conversations with the Defendant and his experience that the Defendant was not having a "competency problem; he was having a bout with his conscience." As such, Mr. Killam testified that based on his experience and what was observed during the penalty phase hearing he did not think the Defendant was incompetent thus there was no need for a competency evaluation. Ms. Stitt testified that after consultation with co-counsel it was determined that the Defendant was not hallucinating but he was experiencing flashbacks thus she did not request a competency hearing at that point. However, Ms. Stitt testified that in hindsight she would have requested a competency hearing.

*314 Hindsight analysis of what actions should have been taken is not the appropriate standard in determining deficiency, the question rests on what the circumstances were at the time that the particular decision was made. The decision not to seek a competency evaluation at the time of the alleged hallucination was based on counsels' interaction with the Defendant, as discussed previously, his demeanor remained constant throughout the representation, discussions with the Defendant following the alleged hallucinations, and approximately 50 years of combined litigation experience. Therefore, the Court finds counsels' decision not to request a competency hearing was based on reasoned professional judgment.
Moreover, the Defendant has failed to establish that but for counsel's alleged deficient conduct there is a reasonable probability the results would have differed. In fact, Justice Bell testified that having dealt with the Defendant in juvenile court and through the process he made the informed decision the Defendant was not hallucinating but disturbed by flashbacks of what happened during the victim's murder. Consequently, this claim is denied.
(Citations omitted.) While postconviction counsel has provided additional information, including Stitt's testimony that she was concerned about Lawrence's competency all along and that she regretted her decision not to request a competency hearing, such hindsight doubts are insufficient to show deficient performance. Lawrence has failed to show any error. A complete review of the record, including both the evidence shown at the evidentiary hearing and the testimony at trial show that it was difficult to determine whether Lawrence was truly experiencing hallucinations or whether he was bothered by the portions of the evidence which were being presented. Lawrence was asked directly about this, and his counsel consulted with him at the time he was reporting these problems. Stitt never stated that the reported hallucinations made her question Lawrence's competency. Instead, counsel asserted that Lawrence's behavior did not change from the initial time when two experts found him competent until the trial was completed. Although both Stitt and Killam had the opportunity to talk with their client immediately after the incidents, the postconviction evidentiary hearing did not reveal any additional information which would have compelled counsel to seek a competency hearing. Finally, Deputy Jarvis testified during the hearing as to his conversation with Lawrence immediately after Lawrence reported his problems. While Deputy Jarvis noted that Lawrence was more upset than he had ever seen him, Lawrence told him that he did not like hearing the tapes because it seemed like the crime was happening all over againsimilar to statements that he made on the record to the judge. Based on the above, there is competent, substantial evidence to support the postconviction court's factual findings, and Lawrence has not shown that the trial court's conclusions of law are erroneous.
Lawrence's concluding contention is that the cumulative effect of the procedural and substantive errors deprived him of a fundamentally fair trial. Because Lawrence has failed to prevail on the merits of any of his individual claims on direct appeal, in this appeal, or in his petition for a writ of a habeas corpus, we deny his claim that he was deprived of a fundamentally fair trial on the basis of cumulative error. See Morris v. State, 931 So.2d 821, 837 (Fla. 2006) (denying claim based on cumulative error where the individual claims making up the cumulative claim were either procedurally barred or without merit).

*315 E. Habeas Petition
In his petition for a writ of habeas corpus, Lawrence raises various challenges to the imposition of death by lethal injection. First, Lawrence claims his appellate counsel rendered ineffective assistance of counsel by failing to present certain arguments as to why his sentence of death was inappropriate. As Lawrence acknowledges, appellate counsel presented substantial proportionality arguments, both in its initial brief, during oral argument, and in a motion for rehearing. This Court reviewed these arguments and denied the claim in a lengthy analysis. See Lawrence, 846 So.2d at 452-55. Accordingly, we deny this claim as procedurally barred. See Zack v. State, 911 So.2d 1190, 1210 (Fla.2005) (denying a claim as procedurally barred where claim "simply refashions a claim that was unsuccessfully raised on direct appeal"); Rutherford v. Moore, 774 So.2d 637, 645 (Fla.2000) (holding that when a claim is actually raised on direct appeal, the Court will not consider a claim that appellate counsel was ineffective for failing to present additional arguments in support of the claim on appeal). Lawrence's other challenges presented in his habeas petition have been previously denied. See supra, note 9.

III. CONCLUSION
Accordingly, we affirm the lower court's denial of Lawrence's 3.851 motion for postconviction relief and deny the petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, and CANTERO, JJ., concur.
BELL, J., recused.
NOTES
[1] On March 29, 1998, Lawrence and Rodgers participated in the attempted murder of an elderly victim who was quietly sitting in his living room watching television with his family when he was shot in the back. On April 9, 1998, Lawrence and Rodgers murdered Lawrence's cousin, Justin Livingston, by stabbing him repeatedly and attempting to strangle him.
[2] See Spencer v. State, 615 So.2d 688 (Fla. 1993).
[3] At the Spencer hearing, the State introduced Lawrence's scrapbook, which included Lawrence's karate certificate, his high school diploma, references to serial killers, and a certificate of "citizenship" in the Ku Klux Klan. The State also introduced books found in Lawrence's trailer and truck, including: The Human Machine; The Anarchist Cookbook; Serial Killers; The Ultimate Sniper: An Advanced Training Manual For Military & Police Snipers; and Silencers, Snipers & Assassins: An Overview of Whispering Death. Lawrence testified and made an apology to Robinson's family.
[4] The trial court found that Lawrence was previously convicted of a felony involving the use or threat of violence to the person and the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
[5] The statutory mitigators were: (1) the capital felony was committed while Lawrence was under the influence of extreme mental or emotional disturbance; (2) the capacity of Lawrence to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; (3) Lawrence was only twenty-three years of age at the time of the crime; (4) Lawrence had a caring and giving relationship with his family; and (5) when growing up, he had a "sick" and disturbed home life.
[6] The nonstatutory mitigating circumstances were: (1) Lawrence was extremely remorseful; (2) Lawrence led law enforcement officers to the scene of the crime and to the body; (3) Lawrence offered to testify against his codefendant in exchange for a life sentence; and (4) Lawrence exhibited model behavior as an inmate.
[7] Lawrence claimed that the trial court erred by: (1) failing to order a competency hearing for Lawrence; (2) refusing to admit into evidence certain facts to support the substantial domination mitigator and then rejecting that mitigator; (3) finding CCP; (4) issuing a defective and unreliable sentencing order; and (5) allowing a lay witness to testify to an opinion reserved for experts. Lawrence also challenged whether Florida's capital sentencing scheme was unconstitutional and whether his death sentence was disproportionate.
[8] At the time of the crime, Hand was the lead detective assigned to the Robinson case and worked for the Santa Rosa County Sheriff's Department.
[9] For the following reasons, we deny the subsequent claims without extended discussion. In issue four, Lawrence contends that under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), equal protection requires that his mental illness be treated similarly to those with mental retardation because both conditions result in reduced culpability. We reject his assertion that the Equal Protection Clause requires this Court to extend Atkins to the mentally ill. See, e.g., Lewis v. State, 279 Ga. 756, 620 S.E.2d 778, 786 (2005) (declining to extend Atkins to the mentally ill); Tigner v. Texas, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940) (holding equal protection "does not require things which are different in fact or opinion to be treated in law as though they were the same"); State v. Hancock, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059-1060 (2006) (declining to extend Atkins to the mentally ill because mental illnesses come in many forms and different illnesses may affect a defendant in different ways and to different degrees, thus creating an ill-defined category of exemption from the death penalty without regard to the individualized balance between aggravation and mitigation in a specific case).

In his fifth claim, Lawrence alleges that his constitutional rights were violated because he was denied the opportunity to interview jurors. This claim is both procedurally barred and without merit. See, e.g., Suggs v. State, 923 So.2d 419, 440 (Fla.2005) (rejecting constitutional challenges to limitations placed on juror interviews and Rule Regulating the Florida Bar 4-3.5(d)(4)); Power v. State, 886 So.2d 952, 957 (Fla.2004) (holding this claim should be raised on direct appeal).
In his sixth claim, Lawrence asserts that execution by electrocution or lethal injection is cruel or unusual punishment. Based on our decision in Diaz v. State, 945 So.2d 1136 (Fla.2006), we affirm the summary denial by the trial court and deny this claim as presented in his petition for a writ of habeas corpus. However, as a result of Diaz's execution, we recognize that litigation concerning the constitutionality of Florida's lethal injection procedures is ongoing in Lightbourne v. McCollum, No. SC06-2391 (Fla. petition filed Dec. 14, 2006). We do not consider those issues here and express no opinion regarding the merits of any subsequent challenge Lawrence may bring related to lethal injection.
In his seventh claim, Lawrence contends that he may be incompetent at the time of his execution, and if he is, his execution will violate Ford v. Wainwright, 477 U.S. 399, 410, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). This claim is not yet ripe for review. See Morris v. State, 931 So.2d 821, 837 n. 15 (Fla.2006).
[10] Competency is considered a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as a factual understanding of the proceedings against him." Id. at 522 (quoting Hill v. State, 473 So.2d 1253, 1257 (Fla.1985)).
[11] Part of Lawrence's claims rely on an assertion that his trial counsel misrepresented the consequences of the plea proceedings and, in essence, promised him a life sentence if he pled. However, such an assertion is contrary to Lawrence's testimony at the postconviction evidentiary hearing, when Lawrence admitted that Stitt told him "[t]hat they couldn't really do anything else for me. I had to plead guilty, and there's a good chance I would get a life sentence or that I would get the life sentence." (Emphasis added.) Clearly, this statement contradicts his other assertions that counsel had made a definitive promise about receiving a life sentence if he pled guilty and contradicts his assertions that he did not understand the impact of his plea.
[12] Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[13] As discussed in Grosvenor, however, a petitioner's assertion that he would have insisted on going to trial is not the only considerationthe court below must weigh the credibility of such assertion and make an objective analysis of the claim in light the factual circumstances surrounding the plea. See Grosvenor, 874 So.2d at 1181-82.