[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-13862
_____

D.C. Docket No. 3:08-cv-00069-SPM


JONATHAN HUEY LAWRENCE,

Petitioner - Appellant,

versus

SECRETARY FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(October 30, 2012)

Before DUBINA, Chief Judge, HULL and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

At issue in this capital case is whether defense counsel were ineffective in

failing to seek a competency hearing at the penalty phase of the defendant's trial, and the corollary question of whether the defendant was in fact incompetent at the time he entered a plea of guilty to the brutal murder of eighteen-year-old Jennifer Robinson. The district court denied habeas relief on both counts. We agree, and accordingly affirm the judgment of the district court.

## I.

## A.

The Florida Supreme Court summarized the essential facts surrounding the grisly murder in this way:

> Lawrence's codefendant, Jeremiah Martel Rodgers, picked up eighteen-year-old Jennifer Robinson from her mother's home on May 7, 1998. Rodgers and Robinson met Lawrence, and all three drove in Lawrence's truck to a secluded area in the woods. After imbibing alcoholic beverages, Robinson had sex with Rodgers and then with Lawrence. At some point thereafter, Rodgers shot Robinson in the back of the head using Lawrence's Lorcin .380 handgun. The gunshot rendered Robinson instantly unconscious, and she died minutes later. Lawrence and Rodgers loaded Robinson's body into Lawrence's truck and drove further into the woods. Lawrence made an incision into Robinson's leg and removed her calf muscle. Rodgers took Polaroid pictures of the body, including a picture of Lawrence's hand holding Robinson's foot. Lawrence and Rodgers buried Robinson at that site.
>
> Investigators traced Robinson's disappearance to Lawrence and Rodgers. When confronted by Investigator Todd Hand, Lawrence denied knowing Robinson and consented to Hand's request to search Lawrence's trailer and truck. After recovering multiple notes written by Lawrence and Polaroid photographs depicting Robinson post-mortem,

2

Hand arrested Lawrence. One page of the recovered notes states in part: "get her very drunk," "yell in her ears to check consicouse [sic]," "even slap hard," "[r]ape many, many, many times," "'slice and dice,' [d]isect [sic] completely," "bag up eatabile [sic] meats," and "bag remains and bury and burn." Another page of notes provides a list of items and tasks, some of which had been checked off or scribbled out. That list includes "coolers of ice = for new meat," strawberry wine, everclear alcohol, scalpels, Polaroid film, and ".380 or-and bowies [knives]." Other items located by investigators during their search of Lawrence's trailer and truck included a box for a Lorcin .380 handgun; empty Polaroid film packages; a piece of human tissue in Lawrence's freezer; a blue and white ice chest; an empty plastic ice bag; disposable gloves; a scrapbook; and several books, including an anatomy book entitled The Incredible Machine, within which had been marked female anatomy pages and pen lines drawn at the calf section of a leg. Lawrence subsequently confessed to his involvement, after waiving his Miranda rights, and led detectives to Robinson's body.

Lawrence v. State, 846 So. 2d 440, 442-43 (Fla. 2003) ("Lawrence I") (footnotes omitted).

Because the circumstances surrounding the guilty plea and penalty phase proceedings are at the core of this appeal, we recount them in some detail. On March 24, 2000, the defendant entered a plea of guilty in the Santa Rosa County Circuit Court before then-Judge Kenneth Bell. Lawrence's trial counsel, Elton Killam and Antoinette Stitt, were both experienced criminal defense lawyers. At the guilty plea proceedings, the trial court began deliberately, asking both defense attorneys if they were satisfied that Lawrence's decision to plead guilty was "his and his alone"; both agreed that it was. The trial court was aware that Lawrence

3

had mental deficiencies, and pressed counsel further: "Are you satisfied because there are some, I think some mental issues and some psychological issues that we'll be getting into in the penalty phase.  And there [are] some limitations in his functioning as I understand.  But are you satisfied that given his current mental situation and any psychological issues there may be that he understands the very serious nature and consequences of this decision?"  Counsel unambiguously replied that Lawrence understood their strategy, which was to forego a guilt phase and avoid the risk of losing credibility with the jury, especially when faced with the overwhelming evidence of Lawrence's guilt. They added that the decision to plead guilty was ultimately the defendant's.  When pressed further about whether Lawrence was merely following the direction of his counsel by pleading guilty, both attorneys again assured the trial court that the decision to plead guilty was Lawrence's, and that the defendant had sufficient understanding of the proceedings.  Notably, defense counsel Killam observed that Lawrence had previously been evaluated for competency by two court-appointed mental health experts, Dr. Larson and Dr. Bingham, in connection with a prior murder proceeding and had been found competent to proceed by both.

The trial court began an extensive colloquy with Lawrence himself.  The court repeatedly asked the defendant whether the decision to plead guilty was his

4

own, rephrasing the questions and asking them many times in order to confirm that Lawrence understood the nature of the proceedings. Lawrence's answers, while predominantly in yes or no form, were consistent throughout the lengthy colloquy, and every response indicated that he understood the nature of the proceedings and that the decision to plead guilty was his alone. One representative portion of the colloquy went this way:

> THE COURT:    Do you understand that this is your decision, not your attorney's decision or anyone else's decision; your mother's or anyone else's to make for you? This is your decision. Do you understand this?
>
> THE DEFENDANT:    Yes, sir.
>
> THE COURT:    Is this decision to plead guilty your decision or is it your attorney's?
>
> THE DEFENDANT:    It is mine.
>
> THE COURT:    Is this decision to plead guilty your mother's decision or your decision?
>
> THE DEFENDANT:    It is mine.
>
> THE COURT:    And again, only you can decide whether or not to plead guilty. This decision is not your attorney's to make. And only you can make the decision. You're the ultimate authority in making this fundamental decision. Do you understand this?
>
> THE DEFENDANT:    Yes, sir.
>
> THE COURT:    And do you have any question about what I've just said or what I said earlier either questioning you or talking to the

5

attorneys?

THE DEFENDANT:      No, sir.

THE COURT:      Is this decision yours alone?

THE DEFENDANT:      Yes, sir.

THE COURT:      Did your attorneys make this decision for you?

THE DEFENDANT:      No, sir.

THE COURT:      So it is your decision?

THE DEFENDANT:      Yes, sir.

Moreover, during the plea colloquy, the State recited the essential facts surrounding the murder of Jennifer Robinson. Among other things, the proffer of proof included the following: that Lawrence and his co-defendant Rodgers took the victim Robinson to a remote part of Santa Rosa County in Lawrence's truck and got her drunk; that Rodgers killed Robinson with a single shot to the head from a .380 handgun belonging to Lawrence; that Lawrence subsequently removed one of Robinson's calf muscles; and that Lawrence had written notes detailing the plans for that evening, which included getting the victim drunk, killing her, and dissecting her corpse. The trial court then asked the defendant Lawrence whether he understood "those facts as stated by the state"; Lawrence replied that he did, and indeed that he believed they were correct. The trial court also detailed each of

6

the four counts leveled against the defendant (conspiracy to commit first degree murder, giving alcohol to a person under 21 years of age, principal to first degree murder, and abuse of a dead human corpse) and asked the defendant whether he understood each of the charges. Lawrence replied in the affirmative as to each charge. The trial court also explained to the defendant that if he pleaded guilty, there were only two possible sentences available to him -- life in prison without parole or death. The defendant again stated that he understood.

At the conclusion of a lengthy interrogation, the trial court accepted the plea, finding that it had been entered freely, knowingly, and voluntarily. The court further found that the decision to plead guilty was made by Lawrence himself, even in light of Lawrence's "limited intellectual ability and mental issues." While the trial court did not make a specific competency finding (because the issue of Lawrence's competency was never raised), the court's detailed colloquy and findings themselves bear directly on Lawrence's competency at the time, particularly the defendant's rational and factual understanding of the nature of the proceedings. See Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam) (setting forth the test for a defendant's competency to stand trial as "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual

7

understanding of the proceedings against him").

The penalty phase trial was presented to the jury in March 2000, a week after the guilty plea. Two incidents occurred during the proceedings that are central to the claims raised in this appeal. The first occurred when a State crime scene technician was testifying on direct examination by the State about the scene where the victim Robinson's body was located. As she began to testify concerning the location, and, more particularly, the mutilated state of the victim's body and the shallow grave in which she was placed, defense counsel Stitt told the court that "our client has just reported that he is having hallucinations and flashbacks." The trial court immediately ordered a 15 minute recess, and the following bench conference occurred after the jury had left the courtroom:

> MS. STITT:    Your Honor, approximately 5 minutes ago my client reported to me that during the state's talking about the pictures and the position of the body and etcetera, that he began to have a, not only visual but auditory hallucinations and flashback.
>
> I've asked the court for a 15 minute recess for Court Security Officer Jarvis to be with him -- he likes Officer Jarvis, he is very calming.
>
> I think that we should reassess the situation in 15 minutes. If he is still experiencing those I'm not sure what we'll do at that point, whether or not we'll excuse him from the courtroom so he does not have to hear that part or --
>
> THE COURT:    Let's just see what happens and see what Jarvis and he say after he's had a chance to talk to him a little bit. And I don't

8

know if he wants to look at possibly getting the jail nurse to come out, but I don't know if what [sic] does any good.

MS. STITT:        We'll wait 15 minutes and see.

After the 15 minute recess, the trial court asked Lawrence if he was okay, and Lawrence replied that he was. Defense counsel also told the court they were satisfied Lawrence was ready to proceed, and the State proceeded from there.

The second incident occurred later on the same day, when the State was introducing into evidence and playing to the jury a tape-recorded statement given by Lawrence to law enforcement regarding his involvement in the prior murder of his cousin, which had been prosecuted in a federal district court. The tape was stopped part-way through when trial counsel Stitt told the court that Lawrence was "indicating to [her] that he is beginning to hallucinate again and he would like to be excused for the playing of the tapes." Again the jury was sent out of the courtroom, and again an extended colloquy took place among the trial judge, Lawrence, and counsel.

The court began by confirming that Lawrence understood his right to be present for the entire trial, and then sought to discern whether Lawrence was truly hallucinating or whether he was simply uncomfortable reliving the details of the murder of his cousin and hearing himself talking to law enforcement about that

9

murder. The court asked Lawrence, "And your counsel has used the word 'hallucination,' but what we are actually talking about is flashbacks, remembering what happened?," to which Lawrence replied "Yes." The trial court also asked the State to weigh in, and the State told the court that "[t]he state does not have an objection if it is an issue of discomfort rather than competency, and Ms. Stitt and Mr. Killam assure me that it is."

The court spoke again with Lawrence at length in order to clarify what Lawrence was experiencing. Counsel Stitt pressed Lawrence to tell the court what he had reported to her, and the following lengthy colloquy ensued:

THE COURT:     Yes. Step up here. Describe to me what is going on.

THE DEFENDANT:     Mainly rather not be here when they hear, I guess my own voice on there.

MS. STITT:     Tell me what you told me about it being the voice of your brother.

THE DEFENDANT:     I'd just rather not hear it.

MS. STITT:     Just a minute ago you told me that you were hearing the voice of your brother, your dead brother.

THE DEFENDANT:     That's what the tape sounds like. And I just don't want to hear it.

MS. STITT:     And did you say anything to me about having visual hallucinations?

10

THE DEFENDANT:    When I was back out in the field and I don't want to be out there.

THE COURT:    So what you are remembering is actually the event?

THE DEFENDANT:    Yes.

THE COURT:    What happened that night?

THE DEFENDANT:    Yes.

THE COURT:    As you are listening to your voice and it is being played you are reliving it in your mind, is that what you are talking about?

THE DEFENDANT:    Yes.

THE COURT:    But is it a true picture in your mind of what happened, is it just like a replay?

THE DEFENDANT:    Yes, sir.  It is -- it makes me real nervous and makes me sweat real bad.

THE COURT:    But you are not hearing other people's voices or things that are not replaying?  I am trying to distinguish between your replaying in your mind what happened in the past as opposed to real strange things going on?

THE DEFENDANT:    I can't really explain it.

THE COURT:    Is it a replay of what happened?  Is that what is troubling you or are you hearing other voices or --

THE DEFENDANT:    I don't know for sure.

THE COURT:    Only you can tell me.

11

THE DEFENDANT:    -- I'm not real sure what to think, I guess that I could go sit back down or something --

MS. STITT:    You just want to be excused?

THE DEFENDANT:    Yes, ma'am.

MS. STITT:    Okay.

THE COURT:    And it's because you are uncomfortable hearing yourself describe what happened, is that the reason?

THE DEFENDANT:    Yes.

THE COURT:    Is there any other reason other than you are just uncomfortable listening to yourself describe, describe what you did, is that the reason?

THE DEFENDANT:    (Nods head affirmative) I think so.

THE COURT:    Anything else?  Or is that the reason?

THE DEFENDANT:    I guess that's it.

THE COURT:    Okay.  I'll allow you to step out and find that you have freely, and voluntarily, and knowingly waived your right to be present during the presentation.

At the beginning of the following day of the penalty phase, the court asked Lawrence if he was "hearing any noises or anything in [his] head," and Lawrence replied "No, sir."

There were no further reports of flashbacks or other incidents during the penalty phase.  The jury recommended death by a vote of 11 to 1.  After a

12

Spencer[1] hearing, the trial judge accepted the jury's recommendation and sentenced Lawrence to death. Lawrence appealed to the Florida Supreme Court, raising many issues, none of which are relevant today. The Florida Supreme Court affirmed Lawrence's convictions and sentence, Lawrence I, 846 So. 2d at 442, and the United States Supreme Court denied certiorari review, 540 U.S. 952 (2003).

## B.

Soon thereafter, Lawrence commenced a series of collateral attacks, filing a Fla. R. Crim. P. 3.850 motion and then a habeas petition in state court. These petitions raised nine claims for relief, including the ineffective assistance of trial counsel. See Lawrence v. State, 969 So. 2d 294 (Fla. 2007) ("Lawrence II"). The state postconviction court conducted an evidentiary hearing in November 2005 concerning ineffectiveness of trial counsel, among other claims. Lawrence called five mental health experts at the hearing, who offered divergent opinions about Lawrence's competency both at the time of the guilty plea and the penalty phase and at the time of the postconviction hearing some five years later.

First called was Dr. Frank Wood, an expert in neuropsychology and PET

---

[1] See Spencer v. State, 615 So. 2d 688, 690-91 (Fla. 1993) (providing for a hearing after the jury has recommended a sentence but before the trial judge has imposed a sentence, the purpose of which is to: "a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity to be heard in person").

13

scans. Dr. Wood had been asked earlier by defense counsel to conduct a PET scan and evaluate Lawrence before the trial back in 2000. Dr. Wood's in-person evaluation of Lawrence occurred on the weekend between the entry of a guilty plea and the start of the penalty phase. Wood testified during the penalty phase about Lawrence's mental illness, although his penalty phase testimony did not address the defendant's competency, nor was he asked to evaluate Lawrence for competency at that time. Dr. Wood did opine that the PET scan revealed "an impaired person with left frontal damage" and that it "was certainly typical of the worst cases of schizophrenia that we see." Dr. Wood concluded that the defendant was schizophrenic.

Dr. Wood was also asked at the postconviction hearing to review the penalty phase incidents and the plea colloquy. He opined that Lawrence was not competent at either time on account of his schizophrenia and the reported hallucinations, although he qualified his answer, observing that he had not personally observed Lawrence during the penalty phase, and therefore his opinion had to be more generic about him and what he understood about his illness. When asked about the guilty plea colloquy, and the long series of yes or no answers given by Lawrence, Dr. Wood said that it was impossible to know what the defendant understood, and, indeed, that it was almost impossible that the

14

defendant understood the full significance of what he was being asked.

Lawrence also called Dr. Robert Napier, a licensed psychologist, to testify on his behalf. Napier also had testified at the penalty phase regarding Lawrence's schizophrenia. Dr. Napier's evaluation of Lawrence occurred on February 28, 1996, four years before the penalty phase, in connection with a claim for Social Security disability. Dr. Napier did not evaluate Lawrence for competency at the time of the penalty phase, but testified that if asked for his opinion back then, he would have had "serious concerns" about Lawrence's capacity and would have recommended further assessment. Dr. Napier also evaluated Lawrence again in 2005 in connection with the evidentiary hearing.

Dr. Napier's diagnosis in 1996 was that Lawrence had "Schizoaffective Disorder which is a form of schizophrenia with an emotional component such as depression withdrawal." Dr. Napier observed that he "saw a significant impairment in thought, concentration, attention," and that the defendant was possibly responding to internal stimuli such as hallucinations. Dr. Napier added that Lawrence was "just on the cuff between low average and average" intelligence. Although Dr. Napier's testimony on direct suggested that he had doubts about Lawrence's capacity to understand what he pleaded guilty to, he made it clear on cross examination that he was not offering a formal opinion about

15

Lawrence's competency either at the time of the guilty plea or the penalty phase, because he had not evaluated Lawrence then.

Dr. Barry Crown, a psychologist, was Lawrence's third expert witness. He too had testified at the penalty phase. He evaluated Lawrence again in February 2005 to determine his competency to proceed at the postconviction hearing. When asked on direct examination what his findings were in the 2005 evaluation, Dr. Crown opined that Lawrence had significant neuropsychological problems, and that the defendant was not competent to proceed or assist counsel in the postconviction proceedings. The primary basis for the conclusion was that the defendant was cognitively impaired and had a level of "thought disturbance, [so] that his attention, his memory, and his recall [were] unreliable."

Crown added that he had evaluated Lawrence for competency at some point after Lawrence's arrest in May 1998, at least a year before the penalty phase was conducted in the instant murder trial. He concluded that Lawrence was not competent at that time either, but he acknowledged that two other psychologists, Dr. Bingham and Dr. Larson, had also evaluated Lawrence in October 1998 and both had found Lawrence to be competent.

The fourth mental health expert called at the state postconviction proceeding was Dr. James Larson, a court-appointed psychologist who evaluated

16

Lawrence in April 2005 for competency to proceed.  Dr. Larson testified that because of the serious nature of the case and the complexity of the issue, he met with Lawrence on six different occasions.  Dr. Larson noted that he had been appointed by a judge to evaluate Lawrence in 1998 for competency to proceed in the federal murder case, but that his 2005 determination was not based on data drawn from the earlier 1998 evaluation.

In 2005, Dr. Larson found that Lawrence was competent to proceed, and, indeed, that Lawrence was malingering based on results drawn from the test of memory malingering, or TOMM.  Dr. Larson opined that the defendant's inconsistent answers to questions such as whether he understood what role a judge plays, demonstrated that Lawrence was malingering, "or choosing not to put forth the maximum effort, or not involved with the task, or trying to present himself as more dull than he really is."

The fifth and final mental health expert was Dr. Lawrence Gilgun, who had also been appointed by the court to evaluate Lawrence for competency to proceed in postconviction.  Dr. Gilgun met with the defendant four times before rendering an opinion that Lawrence was competent.  Dr. Gilgun testified that he used data drawn from the same battery of tests that Dr. Larson had employed, including the TOMM, but that his competency evaluation was independent and he did not

17

consult with Dr. Larson.

Dr. Gilgun opined that Lawrence was malingering and that he was competent to proceed. When asked by Lawrence's counsel why he did not administer a second malingering test after Lawrence's performance on the TOMM, Dr. Gilgun did not mince words, saying, "I've given him a test to see if he is giving it his best shot. He didn't. And that's his choice, not mine; so I got clear results. . . . They were clear that he was malingering." Dr. Gilgun testified that the most likely explanation was that Lawrence "was attempting to appear more impaired than he actually is." Dr. Gilgun explained that his finding of competency was only based in part on the malingering test, and that what he really based his opinion on was what Lawrence told him during the evaluation about "his understanding at and around the time of his trial."

After the conclusion of the lengthy and conflicting mental health testimony presented, the state postconviction court found that Lawrence was competent to proceed during postconviction, specifically crediting the testimony and the report of Dr. Gilgun, and observing that Lawrence had demonstrated an ability to communicate with postconviction counsel.

Apart from the mental health experts, the other relevant testimony presented at the postconviction hearing came from Lawrence's trial counsel, Killam and

18

Stitt, and from Judge Bell. Killam first testified about his substantial experience: he had been a public defender for 31 years at the time of the evidentiary hearing, had handled approximately 25 capital cases before Lawrence's case, and had attended capital litigation seminars. Killam then testified that he was able to elicit responses from Lawrence when he asked Lawrence questions, but that the answers were short and generally yes or no, and that he had to lead him to get more detail. Killam said that he had not worked on Lawrence's case at the time of the October 1998 competency evaluations by Dr. Larson and Dr. Bingham, but that he had read the reports and had great respect for Dr. Larson's opinions. Killam was asked whether he saw "any kind of decaying or degeneration of [Lawrence's] ability to communicate and that type of thing," to which Killam responded, "No. He seemed as he was described to me, before I met him, the same."

On cross examination, Killam testified that Lawrence was a good listener and seemed to comprehend what Killam was telling him. Killam also testified that, in light of the October 1998 competency evaluations and the fact that the defendant had previously entered guilty pleas on two other occasions without any competency problems, he viewed Lawrence's competency as having been decided already. Killam was also asked specifically about the penalty phase incidents. He observed that defense counsel Stitt was sitting with Lawrence at the time, so he

19

did not remember what Lawrence did to get Stitt's attention or what the defendant had said to her. He added that he did not believe Lawrence was having hallucinations; rather, the defendant "was having a bout with his conscience." If Killam thought that the defendant was actually hallucinating, he would have asked for a competency examination.

Judge Bell testified telephonically. As for competency, he said that at the penalty phase hearing he was trying to distinguish between whether Lawrence was truly hallucinating or whether he was "just simply being disturbed by the flashbacks remembering what was going on." He determined that Lawrence was only having flashbacks. He further testified that he would have granted a request for a competency hearing if Stitt or Killam had requested one. On cross examination by the State, Bell said that he had previously encountered the defendant in the juvenile court system and he had not observed any difference in Lawrence's behavior.

Lawrence next called trial counsel Stitt, who testified that she was assigned to Lawrence's case shortly after his arrest in May 1998. She testified that her initial impression of Lawrence was that he was not competent, and that she maintained this impression throughout her representation of him. She testified that she was concerned about Lawrence's competency at the time, that she was

20

aware that she could have asked the court for a competency evaluation, and that she regretted very much her decision not to do so.  She also testified that she knew Dr. Bingham and Dr. Larson had evaluated Lawrence in October 1998 and had found Lawrence competent to proceed.

On cross examination by the State, Stitt testified more fully about her legal experience: she had been a public defender for 20 or 21 years prior to representing Lawrence, and had previously handled murder cases, including one capital case. She again acknowledged her awareness of the October 1998 competency evaluations by Drs. Bingham and Larson, and was asked: "During the course of time that you represented him did his behavior at any time change to where you felt that you needed another competency evaluation other than the time at the trial situation or now upon hindsight think so?," to which Stitt replied, "No, sir.  His behavior remained pretty consistent."  Stitt also testified that when  Lawrence came back into court after the first of the penalty phase incidents, she did not believe that Lawrence was having any hallucinations.

Finally, Court Security Officer Jarvis, the officer with whom Lawrence spoke during the recess after the first penalty phase incident, briefly testified.  He had previously spent time with Lawrence, having been assigned to accompany Lawrence to get the PET scan.  On direct examination by the State, Officer Jarvis

21

was asked what he and Lawrence talked about during the penalty phase recess, to which Jarvis replied: "I don't remember exact word for word, but, I mean, I basically asked him was he all right, because I knew he was upset over something that went on. And he told me, yeah. He was -- I mean, he just -- he said he just didn't want to hear the tapes. It made it seem like it was all happening all over again."

The state postconviction court denied relief on all of the petitioner's claims. The Florida Supreme Court affirmed. Lawrence II, 969 So. 2d 294. In thoroughly addressing Lawrence's Sixth Amendment claim that counsel was ineffective for failing to request a competency hearing, the Florida Supreme Court adopted the analysis of the postconviction trial court, which addressed both the performance and prejudice prongs of Strickland v. Washington, 466 U.S. 668 (1984):

> In turning to the merits of this case, the postconviction court denied this claim as follows:
>
>> In the instant case, Mr. Killam testified that based on his conversations with the Defendant and his experience that the Defendant was not having a "competency problem; he was having a bout with his conscience." As such, Mr. Killam testified that based on his experience and what was observed during the penalty phase hearing he did not think the Defendant was incompetent thus there was no need for a competency evaluation. Ms. Stitt testified that after consultation with co-counsel it was determined that the Defendant was not hallucinating but he was experiencing flashbacks thus she did not request a competency

22

hearing at that point.   However, Ms. Stitt testified that in hindsight she would have requested a competency hearing.

Hindsight analysis of what actions should have been taken is not the appropriate standard in determining deficiency, the question rests on what the circumstances were at the time that the particular decision was made.   The decision not to seek a competency evaluation at the time of the alleged hallucination was based on counsels' interaction with the Defendant, as discussed previously, his demeanor remained constant throughout the representation, discussions with the Defendant following the alleged hallucinations, and approximately 50 years of combined litigation experience.   Therefore, the Court finds counsels' decision not to request a competency hearing was based on reasoned professional judgment.

Moreover, the Defendant has failed to establish that but for counsel's alleged deficient conduct there is a reasonable probability the results would have differed.   In fact, Justice Bell testified that having dealt with the Defendant in juvenile court and through the process he made the informed decision the Defendant was not hallucinating but disturbed by flashbacks of what happened during the victim's murder.   Consequently, this claim is denied.

(Citations omitted.)  While postconviction counsel has provided additional information, including Stitt's testimony that she was concerned about Lawrence's competency all along and that she regretted her decision not to request a competency hearing, such hindsight doubts are insufficient to show deficient performance. Lawrence has failed to show any error.  A complete review of the record, including both the evidence shown at the evidentiary hearing and the testimony at trial show that it was difficult to determine whether Lawrence was truly experiencing hallucinations or whether he was bothered by the portions of the evidence which were being presented.  Lawrence was asked directly about this, and his counsel consulted with him at the time he was reporting these problems.  Stitt

23

never stated that the reported hallucinations made her question Lawrence's competency.  Instead, counsel asserted that Lawrence's behavior did not change from the initial time when two experts found him competent until the trial was completed.  Although both Stitt and Killam had the opportunity to talk with their client immediately after the incidents, the postconviction evidentiary hearing did not reveal any additional information which would have compelled counsel to seek a competency hearing.  Finally, Deputy Jarvis testified during the hearing as to his conversation with Lawrence immediately after Lawrence reported his problems.  While Deputy Jarvis noted that Lawrence was more upset than he had ever seen him, Lawrence told him that he did not like hearing the tapes because it seemed like the crime was happening all over again -- similar to statements that he made on the record to the judge.  Based on the above, there is competent, substantial evidence to support the postconviction court's factual findings, and Lawrence has not shown that the trial court's conclusions of law are erroneous.

Lawrence II, 969 So. 2d at 313-14.

## C.

On February 20, 2008, Lawrence filed his federal habeas petition in the United States District Court for the Northern District of Florida, raising nine claims.  The district court denied the petition on each of them in a detailed order.  The court began by denying Lawrence's request for an evidentiary hearing based on 28 U.S.C. § 2254(e)(2), observing that Lawrence had received a full evidentiary hearing in state court.

Most significant for our purposes is the district court's resolution of Lawrence's substantive competency claim, which was raised for the first time in

24

his federal habeas petition and which the district court addressed on the merits. The district court summarized at length the guilty plea and penalty phase proceedings and the testimony taken from the state postconviction evidentiary hearing. The district court found that, taking all of the evidence as a whole, Lawrence "was competent at the time he entered his plea." The court concluded that while credible medical evidence was presented that Lawrence suffers from schizophrenia, this diagnosis alone was not enough to find that the petitioner was incompetent at the time he entered his plea.

The district court declined to issue a Certificate of Appealability ("COA"). We issued a COA, however, on two claims: whether counsel was ineffective in failing to request a competency hearing during the penalty phase; and whether Lawrence was in fact incompetent at the time he entered a plea of guilty or at the time of the penalty phase.

## II.

Lawrence filed his federal habeas petition after the 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, and, therefore, AEDPA governs the petition and the scope of our review. Penry v. Johnson, 532 U.S. 782, 792 (2001). Under AEDPA, when the state court has adjudicated the petitioner's claim on the merits, a federal court may not grant

25

habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. Id. § 2254(e).

AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted).

We review de novo the district court's determinations of law and mixed questions of law and fact, but review the district court's factual findings for clear error. See Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1177 (11th Cir. 2010). As for the district court's competency finding, we review a district court's determination of "competency to stand trial as a factfinding subject to reversal only for clear error." United States v. Izquierdo, 448 F.3d 1269, 1276 (11th Cir.

26

2006); United States v. Hogan, 986 F.2d 1364, 1371 (11th Cir. 1993).[2]  Moreover, in considering on federal habeas a similar competency claim to the one raised by Lawrence in this case, we have held that "[a] district court's determination that there is insufficient evidence to generate a substantial and legitimate doubt as to a petitioner's competence to stand trial is reviewed for clear error."  Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995).

## A.

To succeed on his ineffective assistance claim, Lawrence must show both deficient performance and prejudice: he must establish both that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 688, 694; accord Wiggins v. Smith, 539 U.S. 510, 521 (2003); Darden v. Wainwright, 477

---

[2]  One year prior to Hogan, a panel of this Court in James v. Singletary, 957 F.2d 1562, 1574 n.18 (11th Cir. 1992), said without citation that "[a]s competency to stand trial constitutes a mixed question of law and fact, this finding [by a state court] would, of course, not have been entitled to a presumption of correctness."  However, in James there never was a state court finding of competency, as indicated by the panel's use of the word "would," and as the text preceding the footnote made clear.  Id. at 1574 ("[N]o state court has found petitioner to have been competent to stand trial.").  Thus, the panel's footnote was opining on the standard of review for an issue not before it.  The later Hogan panel correctly recognized the James footnote as dicta and expressly entered a holding to the contrary.  See Hogan, 986 F.2d at 1372 ("We hold that a district court's determination that a defendant is competent to stand trial is not reviewed de novo, it is not reviewed with a hard look, it is not reviewed under anything other than a clearly erroneous standard.").

27

U.S. 168, 184 (1986).

Moreover, we are not applying Strickland de novo, but rather through the additional prism of AEDPA deference.  28 U.S.C. § 2254(d)(1).  As the Supreme Court has noted, "[t]he standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Harrington, 131 S. Ct. at 788 (internal quotation marks and citations omitted). Thus, under this doubly deferential standard, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable."  Id. at 785 ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.").  And if, at a minimum, fairminded jurists could disagree on the correctness of the state court's decision, the state court's application of Strickland was not unreasonable, and AEDPA precludes the grant of habeas relief.  Id. at 786.

The Florida Supreme Court determined that Lawrence failed to establish either deficient performance or prejudice.  On the performance prong, the Florida Supreme Court adopted the postconviction trial court's determination that the decision not to request a competency hearing was within the reasoned professional judgment of counsel.  Lawrence II, 969 So. 2d at 313-14.  The Florida Supreme Court reviewed the record evidence and determined that the circumstances at the

28

time of the two incidents at the penalty phase did not compel counsel to seek a competency hearing. There is considerable record evidence in support of this determination.

For starters, the Florida Supreme Court adopted the state postconviction court's deference to the approximately 50 years of combined litigation experience between Killam and Stitt. Id. at 314. It was not unreasonable to do so. As this Court has observed in evaluating Strickland claims, "[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc); accord id. at 1316 n.18 ("We accept that even the very best lawyer could have a bad day. . . . Our point is a small one: Experience is due some respect.").

Lawrence relies heavily on the postconviction testimony of trial counsel Stitt, who testified that in hindsight she erred by not requesting a competency evaluation after Lawrence reported flashbacks during the penalty phase. The Florida Supreme Court was not unreasonable in determining that Stitt's hindsight evaluation of her own performance was insignificant. This Court has repeatedly explained that because the Strickland standard is an objective one, see Darden, 477 U.S. at 187; Strickland, 466 U.S. at 688, counsel's own admission of deficient

29

performance in hindsight is not to be afforded much, if any, weight.  See Chandler,

218 F.3d at 1315 n.16 ("Because the standard is an objective one, that trial counsel

(at a post-conviction evidentiary hearing) admits that his performance was

deficient matters little."); Tarver v. Hopper, 169 F.3d 710, 716 (11th Cir. 1999);

Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir. 1992).

In the second place, the Florida Supreme Court credited Killam's testimony

that based on his conversations with Lawrence and his experience, he did not think

Lawrence was having a "competency problem"; rather, in Killam's view Lawrence

"was having a bout with his conscience" and therefore there was no need to

request a competency hearing.  Lawrence II, 969 So. 2d at 313.  Moreover, while

Stitt did say that in hindsight she would have requested a competency evaluation,

she also testified that when Lawrence returned from the first of the penalty phase

incidents she did not believe he was hallucinating.  Notably, neither counsel

testified at the postconviction hearing, in words or substance, that Lawrence was

ever unable to communicate with them or assist them in his defense during their

lengthy representation of him.

Third, the Florida Supreme Court also noted that two experts found

Lawrence competent in October 1998 and that both Stitt and Killam testified that

"Lawrence's behavior did not change from the initial time when two experts found

him competent until the trial was completed." Id. at 314.  The Florida Supreme Court also credited the postconviction testimony of the trial judge, who conducted a lengthy colloquy with counsel and Lawrence at the time of the reported hallucinations and averred that he "made the informed decision [that] the Defendant was not hallucinating but [was] disturbed by flashbacks of what happened during the victim's murder." Id.  The court further credited the evidentiary hearing testimony of Officer Jarvis as consistent with the on-the-record statements made by Lawrence to the trial judge that Lawrence did not like hearing the tapes because they made it seem like the crime was happening all over again. Id.  It was not unreasonable for the Florida Supreme Court to credit all of this testimony, which was accurately drawn from the record and all of which pointed toward the conclusion that Lawrence was competent to proceed during the penalty phase.  In short, the record demonstrates that the state court's conclusion on the performance prong of Strickland -- that counsel's decision not to request a competency hearing under the circumstances reflected reasoned professional judgment, and, therefore, did not fall below an objectively reasonable standard of performance -- was not an unreasonable application of Strickland.

As for prejudice, in order to succeed on his Strickland claim before the state postconviction court Lawrence would have had to show a reasonable probability

31

that the outcome of the proceedings would have been different but for the alleged deficiency in counsel's performance. Strickland, 466 U.S. at 694. In other words, Lawrence was required to show that there was a reasonable probability that he would have received a competency hearing and been found incompetent had counsel requested the hearing.

Based on much of the same corpus of evidence, the Florida Supreme Court's determination that Lawrence failed to show Strickland prejudice was not unreasonable. At least three basic blocks of record evidence support the reasonableness of the Florida Supreme Court's determination. First, in October 1998, approximately 17 months before the guilty plea and penalty phase, Lawrence was evaluated for competency by two court-appointed experts, Dr. Larson and Dr. Bingham, both of whom found Lawrence to be competent. While Lawrence tries to minimize the impact of these evaluations by pointing out that they took place over a year prior to the proceedings at issue, these competency evaluations are further connected to Lawrence's competency during the March 2000 proceedings by the postconviction testimony of Killam and Stitt. Both testified that Lawrence's behavior remained consistent throughout their representation of him -- which in Stitt's case pre-dated the October 1998 evaluations. Similarly, the trial judge testified that he had prior encounters with

32

Lawrence in the juvenile system and that he did not observe any differences in Lawrence's behavior between these earlier dealings and the time of the trial in this case. Killam further testified that he respected the opinion of Dr. Larson and had no reason to question it and that, in Killam's view, the question of Lawrence's competency had already been resolved by the time of the March 2000 proceedings.

The second block of evidence is the record of what actually transpired at the guilty plea and the penalty phase. The trial judge engaged in an extensive plea colloquy with both Lawrence and counsel, recognizing that Lawrence's mental capacity was a serious issue and asking and rephrasing fundamental questions several times to confirm that Lawrence understood the nature of the proceedings and that the decision to plead guilty was Lawrence's.[3] While the state trial court did not make a specific competency finding, the trial court's detailed colloquy, Lawrence's rational and consistent responses to the trial court's questions, and the state trial court's finding that Lawrence's guilty plea was knowing and voluntary nonetheless support the reasonableness of the Florida Supreme Court's conclusion on Strickland prejudice. Moreover, the trial court also engaged in extensive

---

[3] Indeed, in this appeal Lawrence does not, and cannot, challenge the Florida Supreme Court's determination that his guilty plea was knowing and voluntary, because that separate claim of Lawrence's federal habeas petition was already resolved against him, and is not included in the Certificate of Appealability to this Court. See Murray v. United States, 145 F.3d 1249, 1251 (11th Cir. 1998) ("[I]n an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the COA.").

33

colloquies with Lawrence at the time of the two incidents during the penalty phase. He ultimately found based on Lawrence's responses during the second incident that Lawrence freely, knowingly, and voluntarily waived his right to be present while Lawrence's tape-recorded statements to law enforcement were being played to the jury.

The third block of record evidence that supports the reasonableness of the Florida Supreme Court's conclusion on Strickland prejudice is found in the state postconviction evidentiary hearing in 2005, in particular the finding that Lawrence was competent to proceed in postconviction. While the evidentiary hearing occurred five years after the penalty phase, and therefore the state postconviction court's finding is hardly dispositive about Lawrence's competency back in March of 2000, it is nonetheless probative for several reasons. Most importantly, the state court considered the exact testimony on which Lawrence now seeks to rely, in particular the evidentiary hearing testimony of Dr. Wood and Dr. Crown, and chose to instead credit the contrary report of Dr. Gilgun, a court-appointed expert who evaluated Lawrence in 2005 and found that Lawrence was malingering and was competent to proceed in postconviction. It is also notable that the state court recognized the distinction between having a long-standing mental disorder and being legally competent. The state postconviction court found that

34

notwithstanding Lawrence's mental illness, Lawrence was able to assist his postconviction counsel and communicate with counsel regarding the proceedings five years earlier.

Based primarily on these distinct categories of overlapping evidence, the Florida Supreme Court's determination that Lawrence failed to show a reasonable probability that he would have been found incompetent had counsel requested an evidentiary hearing was not an unreasonable one. Accordingly, AEDPA bars relief on Lawrence's Strickland claim. While Lawrence was able during the state postconviction proceedings to present medical experts who testified that Lawrence was not competent during the March 2000 proceedings, it is notable that neither Dr. Wood nor Dr. Crown, both of whom testified during the penalty phase itself, mentioned in their penalty phase testimony or otherwise brought to the attention of the trial court at that time any concerns about Lawrence's competency. Moreover, it is also notable that the state postconviction court credited other experts over Drs. Wood and Crown in finding Lawrence competent to proceed in 2005. Taking the state court record as a whole, and examining it through the prism of double deference, the new testimony adduced at the postconviction evidentiary hearing on which Lawrence relies is insufficient to establish that the Florida Supreme Court's determination was an unreasonable application of Strickland, or, in other words,

35

that no fairminded jurist could reach the conclusion that a unanimous[4] Florida

Supreme Court reached here.  Lawrence II, 969 So. 2d at 315.

### B.

Lawrence's second claim is that he was not in fact competent to enter a

guilty plea or to stand trial during the penalty phase, and therefore that the

proceedings violated his substantive due process rights under the Sixth and

Fourteenth Amendments.  The Supreme Court precedent that forms the basis for

this claim is found in  Dusky v. United States, 362 U.S. 402 (1960).  There, the

Supreme Court set forth a two-pronged standard for determining legal

competency: "[T]he test must be whether [the defendant] has sufficient present

ability to consult with his lawyer with a reasonable degree of rational

understanding -- and whether he has a rational as well as factual understanding of

the proceedings against him."  362 U.S. at 402 (internal quotation marks omitted).[5]

As an initial matter, the State argues that we should treat this Dusky claim

as being procedurally defaulted because it was never raised in the state courts, and

---

[4] Justice Bell, as the trial judge and one of the postconviction witnesses in this case, was recused.  Lawrence II, 969 So. 2d at 315.

[5]  A substantive competency claim of the kind Lawrence raises here is often referred to as a Dusky claim, in contrast to a procedural competency claim that the trial court committed error by not ordering a competency hearing, which is often referred to as a Pate claim.  See Pate v. Robinson, 383 U.S. 375 (1966).

because there is no basis for categorically excluding substantive competency claims from AEDPA's exhaustion requirement, 28 U.S.C. § 2254(b)(1)(A) (providing that an application for writ of habeas corpus shall not be granted unless "the applicant has exhausted the remedies available in the courts of the State"). We have both pre- and post-AEDPA precedent, however, holding that substantive competency claims generally cannot be procedurally defaulted.  See Pardo v. Sec'y, Fla.  Dep't of Corr., 587 F.3d 1093, 1101 n.3 (11th Cir. 2009); Wright v. Sec'y, Dep't of Corr., 278 F.3d 1245, 1258-59 (11th Cir. 2002) ("The district court's ruling that Wright had procedurally defaulted his substantive due process mental competency claim is contrary to the law of this circuit that such claims generally cannot be defaulted." (citing Johnston v. Singletary, 162 F.3d 630, 637 (11th Cir. 1998); Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995); Adams v. Wainwright, 764 F.2d 1356, 1359 (11th Cir. 1985)).  The State's disagreement with this precedent is of no moment, because we are bound by the holdings of our prior panels.  United States v. Smith, 122 F.3d 1355, 1359 (11th Cir. 1997) ("Under the prior panel precedent rule, we are bound by earlier panel holdings . . . unless and until they are overruled en banc or by the Supreme Court."); see also Wright, 278 F.3d at 1259 ("Bound as we are to follow prior panel precedent, we conclude that Wright's substantive due process claim relating

to mental competency is not procedurally barred, and we will address its merits."). Thus, just like the district court, we address de novo Lawrence's Dusky claim on the merits and "review it without any § 2254(d)(1) deference, because there is no state court decision on the merits" to which we may defer. Wright, 278 F.3d at 1259.

In advancing his substantive competency claim, Lawrence "is entitled to no presumption of incompetency and must demonstrate his . . . incompetency by a preponderance of the evidence." James v. Singletary, 957 F.2d 1562, 1571 (11th Cir. 1992). Relatedly, we have said that in order to be entitled to an evidentiary hearing on a substantive competency claim, which Lawrence seeks here, a petitioner must present "clear and convincing evidence" that creates a "real, substantial, and legitimate doubt" as to his competence. Id. at 1573; accord Medina, 59 F.3d at 1106; Card v. Singletary, 981 F.2d 481, 484 (11th Cir. 1992) ("The standard of proof is high. The facts must positively, unequivocally and clearly generate the legitimate doubt." (alterations and quotation marks omitted)).

Lawrence has not met that high burden, especially because he must show that the district court's finding that Lawrence was competent was not just wrong, but clearly erroneous. See Medina, 59 F.3d at 1106. The substantial corpus of evidence supporting the district court's competency finding is largely the same as

the record evidence, described in detail supra, supporting the Florida Supreme

Court's determination that Lawrence failed to establish either counsels' deficient

performance or prejudice under Strickland.  The October 1998 competency

evaluations, the transcripts taken from (and the evidentiary hearing testimony

regarding) the March 2000 guilty plea and penalty phase proceedings, and the

state court's 2005 competency finding crediting the court-appointed experts who

found Lawrence competent and reported malingering over Lawrence's experts all

support the district court's competency determination.

Nor was the district court's reliance on our decision in Wright misplaced.

In addressing de novo the merits of a substantive competency claim, the panel in

Wright determined that a diagnosis of chronic schizophrenia, on its own, was "not

enough to create a real, substantial, and legitimate doubt as to whether [the

petitioner] was competent to stand trial."  Id. at 1259.   The panel in Wright

reiterated the law of this Circuit that "'[n]ot every manifestation of mental illness

demonstrates incompetence to stand trial; rather, the evidence must indicate a

present inability to assist counsel or understand the charges.'"  Id. (quoting

Medina, 59 F.3d at 1107 (emphasis added)); accord Medina, 59 F.3d at 1107

("[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational

behavior can be equated with mental incompetence to stand trial.").  Moreover,

39

unlike this case, the petitioner in <u>Wright</u> had actually been found incompetent on multiple occasions, once seventeen years <u>before</u> trial and another time seven years and eight months <u>after</u> trial, both of which we considered relevant but not sufficient to counter the evidence of Wright's competence at the time of trial. <u>Wright</u>, 278 F.3d at 1259.  Thus, while the district court in this case recognized that "credible medical evidence was presented that Petitioner probably suffers from schizophrenia," its conclusion that "this diagnosis alone is not enough to convince this court that Petitioner was incompetent at the time that he entered his plea" was fully consonant with our precedent and was supported by the record as a whole.   In short, there is no basis on this record to conclude that the district court's finding that Lawrence was competent was clearly erroneous.  Thus, Lawrence is not entitled to relief on the merits of his substantive competency claim.

Accordingly, we affirm.

**AFFIRMED.**