[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12112

_____

D.C. Docket No. 8:10-cv-00382-JSM-AEP

PERRY ALEXANDER TAYLOR,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 28, 2014)

Before MARCUS, PRYOR, and JORDAN, Circuit Judges.

MARCUS, Circuit Judge:

In 1989, Perry Alexander Taylor was convicted of the grisly first-degree murder and sexual battery of a thirty-eight-year-old woman. After trial, Taylor was sentenced to death. He now appeals from the district court's denial of habeas relief, raising two guilt-phase claims: (1) whether the state trial court violated his due process rights by excluding corroborative evidence proffered by the defense; and (2) whether trial counsel rendered ineffective assistance of counsel by calling Taylor to testify at trial and having him reenact the murder. After thorough review, we also conclude that Taylor is not entitled to relief on either claim and, accordingly, affirm.

I.

A.

The essential facts are these. On October 24, 1988, Geraldine Birch's severely beaten body was found in the third-base dugout of the Belmont Heights Little League field in Tampa, Florida. Taylor v. State, 583 So. 2d 323, 325 (Fla. 1991) (per curiam). Two drag marks on the ground of the dugout led to the victim's heels, which were covered in dirt. The victim's dress was pulled up around her neck. Law enforcement officers recovered her dentures, a wig, and swatches of hair strewn near her corpse.

Twenty-two-year-old Taylor had been at "the cut," an alley near the baseball field, around the time of the murder. When the police first interviewed Taylor as a

witness, he told the officers he had not been to the Belmont field in over six weeks and promised to listen for "street talk . . . concerning the offense." In response to the officers' request, Taylor handed over the Adidas tennis shoes and the pair of jeans he was wearing on the night of October 23rd. Law enforcement then matched shoe prints discovered at the murder scene to the shoes Taylor had provided. Two days later, the police interviewed Taylor a second time. Once again, Taylor initially denied his involvement, but after the officers confronted him with the positive identification, he confessed to killing Birch.

On November 16, 1988, a Hillsborough County jury indicted Taylor for first-degree murder and sexual battery. At trial, the State proceeded under two theories: (1) pre-meditated murder; and (2) felony murder, since the killing occurred during the course of a sexual battery. The defense was built around the claim that Taylor was guilty of only second-degree murder and that the sexual contact between the defendant and the victim was consensual in nature. Birch had offered sex in exchange for money or cocaine. Moreover, the defense theory went, Taylor beat Birch because he became "absolutely enraged" and was "operating from a depraved mind," not with any premeditated intent.

The State's evidence adduced during a three-day trial included Taylor's extensive murder confessions to Detectives George McNamara and Melvin Duran. Detective McNamara, the lead investigator in the case, interviewed Taylor first.

3

The detective testified that Taylor informed him that he ran into Birch around 4:00 a.m. on October 24, 1988 at "the cut." Birch agreed to have oral sex with Taylor in the dugout, and while performing fellatio, she bit down on his penis. Taylor proceeded to choke Birch with both hands for about two to three minutes, as she made "a gasping noise . . . to try to get her breath." Then, Taylor said he clenched his right fist and struck Birch in the face several times. When she collapsed onto the ground, he dragged her to the other end of the dugout and dropped her, whereupon he kicked the lifeless victim three to four times in her upper chest area and stomped on her two to three times. Notably, Taylor did not mention anything about Birch's offer of sex in exchange for crack or money. After interviewing Taylor, Detective McNamara turned the defendant over to Detective Duran, who collected hair and saliva samples.

Detective Duran testified that Taylor similarly admitted that he choked, struck, kicked, and stomped Birch to death after she bit his penis. Although Taylor denied engaging in vaginal sex with Birch to Detective McNamara, Taylor informed Detective Duran that "he had penis-to-vagina intercourse with the victim" before she performed oral sex. At the conclusion of his interview with Taylor, Detective Duran examined the defendant's penis and had an identification technician photograph it. The detective did not observe any abrasion, laceration, or injury consistent with bite marks, but he did notice a small white dot.

4

Dr. Lee Miller, the medical examiner who performed the autopsy on Birch's body, also took the stand. He testified that the cause of death was massive blunt injuries to the head, neck, chest, and abdomen, reflecting "a beating . . . with hands and/or feet." Birch suffered a minimum of about ten blows, all of which occurred at or near the time of death. Dr. Miller described the victim's horrific injuries, including extensive bleeding in the brain; torn and fractured kidneys, intestines, lungs, and ribs; a "pulped" liver; a damaged heart and spleen; and patterned bruises all across the face, chest, and stomach. Dr. Miller opined that the death was likely not instantaneous. Moreover, he observed numerous injuries both inside and adjacent to the outside of the victim's vagina that were inconsistent with Taylor's sexual-consent defense. In his medical opinion, these lacerations were caused by "[s]omething [that] was inserted into the vagina which stretched the vagina enough for it to tear over the object that was inserted in there." Images of the ghastly wounds Taylor inflicted on Birch corroborated the law enforcement officials' and the doctor's testimony. One photograph of the victim's chest, for example, depicted bruising with a design similar to the shoe impressions found in the dugout.

After the prosecution rested its case, Taylor proffered testimony from three of Birch's sisters, who saw the victim occasionally purchase or use crack cocaine between one and five-and-a-half months before she was murdered. Outside the

presence of the jury, Joyce Robinson testified that she had seen her sister buy crack cocaine "[j]ust one time" about five-and-a-half months before her demise. Another sister, Alice Rose, asserted that she had seen Birch "once use" crack cocaine about three-and-a-half months before she died. When defense counsel asked if Birch "was a heavy user," Rose responded, "Well, half the time she couldn't get it." Finally, Yvonne Robinson testified that she had seen her sister use crack cocaine "maybe two, three times." The last time she saw Birch using crack was about a month before her death in their mother's utility room. Robinson also acknowledged that Birch was involved with a man who had a few prostitutes working for him out of Sulphur Springs. None of the sisters, however, had ever witnessed Birch offer to sell her body for crack. Ultimately, the trial court excluded the proffered testimony, ruling that the sisters' accounts were irrelevant to the claim of sexual consent and remote in time.

Taylor took the stand to establish his second-degree murder defense. He testified that on the night of the murder, he went to Manila Bar with some friends. Around 3:45 or 4:00 a.m., after the bar had closed, the group migrated to "the cut." They were outside "shooting the bull" when Birch approached. She talked briefly with others in the group, and then all but Taylor and a friend walked off. Taylor, 583 So. 2d at 325. Taylor testified that as he began to walk away, Birch called out to him and told him she was trying to get to Sulphur Springs. He informed her that

he did not have a car. She then offered "sexual favors," or to "turn a trick," in exchange for "a five dollar hit of crack and ten dollars." When Taylor indicated he "couldn't help her on the drugs part of the situation," Birch decided ten dollars would do. The pair then headed towards the Belmont Little League field.

Taylor testified that upon reaching the third-base dugout, he sat down on a bench. Defense counsel asked Taylor to position himself in the chair as if it were the bench, and Taylor complied. Taylor described that he and Birch attempted to have vaginal intercourse in the dugout for less than a minute. Id. Birch then ended the attempted intercourse and began performing fellatio instead. According to Taylor, he complained to Birch that her teeth were irritating him and tried to pull away. She bit down on his penis. Acting "out of reflexes," Taylor claimed he "grabbed her immediately" and choked her.

At that point, defense counsel asked Taylor to remove his sweater so that the jury could view his strong arms and chest. Counsel also inquired about Taylor's exercise regimen and weight-lifting abilities, instructing Taylor to show the jury what a "dead lift" is. Following this demonstration, Taylor described how once he succeeded in getting Birch to release her bite, he struck and kicked her several times in anger. The entire incident "was over before it started."

To corroborate his version of the events, Taylor introduced testimony from two of his friends who were with him at "the cut" on the early morning of October

7

24th. Otis Allen testified that Birch approached the group and told Taylor she wanted to exchange sex for "money or stones." As Allen left, he witnessed Birch walking freely and voluntarily with Taylor towards the baseball field. Adrian Mitchell testified that he saw Birch approach Taylor and converse with him. Then he witnessed Birch motioning to Taylor to follow her, and the pair walked off together.

On May 11, 1989, the jury reached a verdict, finding Taylor guilty of both murder in the first degree and sexual battery with great force.

During the penalty phase of the trial, the State called only one witness: a detective who had investigated Taylor's prior sexual battery conviction in 1982. The detective testified that the twelve-year-old female victim alleged that Taylor, who was sixteen years old at the time, forcibly raped her, and Taylor pled no contest to the charge. Six witnesses testified on Taylor's behalf. Three law enforcement officers who had supervised Taylor since his arrest for Birch's murder described the defendant as a model inmate. According to the officers, Taylor treated everyone at the prison with respect, worked harder than was expected, and caused no problems whatsoever. Angelina Hicks, Taylor's good friend, asserted that Taylor was easygoing and never violent, and that she trusted Taylor with her children. Carolyn Thornton, who had a brief relationship with Taylor before his arrest, described him as "very gentle."

Finally, Dr. Gerald Mussenden, an experienced clinical psychologist, testified about Taylor's traumatic childhood. Dr. Mussenden had evaluated the defendant back when he was in custody in 1982 and again during his current period of incarceration. He explained that when Taylor was only seven years old, he was diagnosed as "emotionally disturbed" and placed under the custody of Health and Rehabilitative Services. Taylor's foster mother physically and emotionally abused him during his formative years. Taylor was ecstatic to return home at age fourteen, but he became extremely upset and angry when he discovered that another male figure had entered his home. Because Taylor was ungovernable, his own mother voluntarily returned him to Health and Rehabilitative Services again, exacerbating Taylor's feelings of rejection and abandonment. Taylor did not receive any psychotherapy or help to cope with these scarring experiences. According to Dr. Mussenden, Taylor had a relatively high IQ and could have been a very successful athlete, but his potential was stymied by the years of built-up rage and untreated trauma he endured.

Unpersuaded by this mitigation evidence, the jury unanimously recommended the death sentence. The trial court imposed the jury's recommendation, finding no statutory or non-statutory mitigating circumstances, and three statutory aggravating factors: (1) Taylor was previously convicted of a felony involving the use of violence, Fla. Stat. § 921.141(5)(b); (2) the homicide

9

was committed during a sexual battery, id. § 921.141(5)(d); and (3) the capital felony was especially wicked, evil, atrocious, or cruel, id. § 921.141(5)(h).

B.

On direct appeal, Taylor raised three claims relating to the guilt phase of trial, including whether the trial court erred in barring the testimony of Birch's three sisters. Taylor argued this evidence would have shown that Birch was a crack cocaine user, and thus would have corroborated his basic testimony and provided crucial support for his sexual-consent defense. The Florida Supreme Court rejected this claim, explaining:

> We find no error in the trial court's exclusion of this testimony. A person seeking admission of testimony must show that it is relevant. Stano v. State, 473 So. 2d 1282, 1285 (Fla. 1985), cert. denied, 474 U.S. 1093, 106 S. Ct. 869, 88 L. Ed. 2d 907 (1986). To be relevant, evidence must tend to prove or disprove a fact in issue. Id. The fact that the victim may have used or purchased crack cocaine on occasions prior to her death does not tend to show that she consented to sex with Taylor on the night in question. None of the witnesses whose testimony was excluded had observed the victim offer sex for drugs or money. Absent a link between the prior cocaine use and sexual activity by the victim, the testimony simply was not probative of whether she consented to sexual activity with Taylor before the fatal beating.

Taylor, 583 So. 2d at 328. The Florida Supreme Court ultimately affirmed Taylor's convictions. Id. at 330. But it reversed his death sentence and remanded for resentencing because the prosecutor had made an improper closing argument at the penalty phase. Id.

By an 8-to-4 vote, a newly empaneled jury again recommended the death penalty, and the trial judge again found the same three aggravating factors and no statutory mitigators. However, it did accord "some weight" to Taylor's deprived family background and the abuse he reportedly suffered as a child. The court also considered, but afforded "very little weight" to, evidence of Taylor's remorse, psychological testimony about Taylor's potential brain injury, and testimony concerning Taylor's good conduct in custody. Determining that the aggravating circumstances outweighed the non-statutory mitigators, the trial court reimposed the death sentence. The Florida Supreme Court affirmed, Taylor v. State, 638 So. 2d 30 (Fla. 1994) (per curiam), and the U.S. Supreme Court denied Taylor's petition for writ of certiorari, Taylor v. Florida, 513 U.S. 1003 (1994).

## C.

On March 12, 1996, Taylor filed his first state court motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. His fourth and final amended postconviction motion was filed in the state court some nine years later in 2005. Relevant to this appeal, Taylor specifically averred that trial counsel was constitutionally ineffective because he placed Taylor on the witness stand without preparation, and then directed the petitioner to reenact choking the victim during the guilt phase of trial.

Over the course of several years, the trial court conducted numerous Huff[1]

hearings and evidentiary hearings. Notably, at an evidentiary hearing held on

October 8, 2003, Taylor's guilt-phase trial counsel, Nick Sinardi, testified. Before

taking on Taylor's case, Sinardi had worked as both a prosecutor and private

defense attorney for about ten years and had tried a number of capital cases. In

light of Taylor's damning confessions to the police, the State had a very strong

case against his client. To prepare for trial, Sinardi hired a private investigator,

who spent over 100 hours obtaining background information, researching court

records, and interviewing 68 potential witnesses. Sinardi also filed numerous pre-

trial motions, including an unsuccessful motion to suppress Taylor's detailed

confessions.

After carefully reviewing the discovery evidence, speaking with his client,

and weighing the alternatives, Sinardi determined Taylor's best available trial

defense was that he committed "depraved mind and consensual sex, second-degree

murder." To establish this, counsel believed it was in Taylor's best interest to take

the stand. He sought to characterize Taylor, whose soft-spoken demeanor did not

match his imposing physique, as a "gentle giant." He wanted the jury to understand

how this "big, powerful man" -- who was six feet two inches tall, and weighed

---

[1] See Huff v. State, 622 So. 2d 982, 983 (Fla. 1993) (holding that, because of the severity of punishment at issue in a death penalty postconviction case, the judge must allow the attorneys the opportunity to appear before the court and be heard on an initial postconviction motion).

about 235 pounds -- could have unintentionally killed the petite victim upon becoming enraged. Sinardi also wanted the jury to hear from Taylor about the victim's proposition to exchange sex for money. He explained that he generally advises clients that they must be prepared to testify, and the defendant makes that decision at the close of the State's case or the defense case. He recalled specifically instructing Taylor to testify truthfully, but he did not rehearse Taylor's testimony with him because, based on his experience, this was not a beneficial practice. The prosecutor likewise opined that Taylor had to testify if the defense was going to argue second-degree murder. Moreover, the prosecutor said he too was unaware of any other defense that would have been available to Taylor.

On February 1, 2006, the state postconviction court rejected all twenty-one of Taylor's postconviction claims, concluding, inter alia, that Taylor failed to demonstrate any deficiency or resulting prejudice from Sinardi's performance. Taylor again appealed to the Florida Supreme Court, pressing his claim that Sinardi rendered ineffective assistance. The state's highest court affirmed, concluding that Taylor had not established deficient performance under Strickland v. Washington, 466 U.S. 668 (1984): "On the record before us, . . . Taylor . . . has not shown that he testified against his will, nor has he met the burden to demonstrate that Sinardi's strategy was unreasonable under the circumstances, especially considering the limited choices available to the defense." Taylor v.

13

State, 3 So. 3d 986, 996 (Fla. 2009). The Florida Supreme Court did not address prejudice. Id. at 996-97.

### D.

On February 5, 2010, Taylor commenced his federal habeas corpus petition in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 2254. He raised seventeen claims in all. In a detailed order entered on June 1, 2011, the district court denied each of them. Taylor v. Sec'y, Dep't of Corr., 8:10-CV-382-T-30AEP, 2011 WL 2160341 (M.D. Fla. June 1, 2011).

As for whether the trial court erred in excluding the victim's sisters' testimony, the district court first rejected the State's argument that this claim was procedurally barred. Id. at *10. The district court explained that Taylor fairly presented his federal constitutional claim in his brief before the Florida Supreme Court by citing to Chambers v. Mississippi, 410 U.S. 284 (1973), and arguing that the exclusion of the sisters' testimony violated his Sixth Amendment rights. Taylor, 2011 WL 2160341, at *10. Turning to the merits, the district court concluded that the Florida Supreme Court's determination was neither contrary to nor an unreasonable application of clearly established federal law because the state court's evidentiary ruling did not rise to the denial of fundamental fairness. Id. at *13. The victim's sisters' proffered testimony was not "material in the sense of

14

being crucial, critical, or highly significant," and the exclusion "did not fatally infect the trial so as to deprive Taylor of due process." Id. at *12.

As for Taylor's complaint that trial counsel was ineffective for placing him on the stand during the guilt phase of trial, the district court agreed with the Florida Supreme Court's determination that Taylor had failed to establish deficient performance. Id. at *36. Relying largely on Sinardi's postconviction testimony, the district court concluded that counsel made a strategic decision to put Taylor on the stand to explain that Taylor and the victim agreed to sex in exchange for money, the sex was consensual, Taylor became enraged when the victim bit his penis, and he had no intent to kill her. Id. at *37. Counsel also reasonably sought to demonstrate how powerful Taylor was, and that because of his significant strength, his blows quickly led to the petite victim's demise. Id. In short, "counsel's decision to put Taylor on the stand and testify, and pursue the defense he presented, fell within the range of reasonable conduct." Id. at *38. The district court declined to grant a Certificate of Appealability ("COA"). Id. at *65. We issued a COA, however, on two claims: (1) whether the trial court erred in excluding corroborative evidence in violation of the due process right articulated in Chambers, 410 U.S. 284; and (2) whether trial counsel provided ineffective assistance at the guilt phase of trial by calling Taylor to testify and having him reenact the murder without preparation.

15

II.

We review de novo a district court's determinations of law and mixed questions of law and fact. Lawrence v. Sec'y, Florida Dep't of Corr., 700 F.3d 464, 476 (11th Cir. 2012). A district court's factual findings, however, are reviewed only for clear error. Id.

Taylor filed his federal habeas petition after the 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. Thus, AEDPA governs the petition and scope of our review. Penry v. Johnson, 532 U.S. 782, 792 (2001). Under AEDPA, when the state court has adjudicated the petitioner's claim on the merits, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Jones v. GDCP Warden, No. 11-14774, 2014 WL 2957433, at *10 (11th Cir. Apr. 24, 2014) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "Under

16

§ 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Williams, 529 U.S. at 413).

For § 2254(d), clearly established federal law includes only the holdings of the Supreme Court -- not Supreme Court dicta, nor the opinions of this Court. White v. Woodall, 134 S. Ct. 1697, 1702 (2014). To clear the § 2254(d) hurdle, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011). "[A]n 'unreasonable application of' [Supreme Court] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." Woodall, 134 S. Ct. at 1702 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). A state court need not cite or even be aware of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); accord Richter, 131 S. Ct. at 784.

"AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (citations and internal quotation

17

marks omitted). And when a claim implicates both AEDPA and <u>Strickland</u>, our review is doubly deferential. <u>Richter</u>, 131 S. Ct. at 788 ("The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." (citations and internal quotation marks omitted)). Taylor must establish that no fairminded jurist would have reached the Florida court's conclusion. <u>See</u> <u>Richter</u>, 131 S. Ct. at 786-87; <u>Holsey v. Warden, Ga. Diagnostic Prison</u>, 694 F.3d 1230, 1257-58 (11th Cir. 2012). "If this standard is difficult to meet, that is because it was meant to be." <u>Richter</u>, 131 S. Ct. at 786. We agree with the district court that Taylor failed to meet this exacting standard.

### A.

Taylor first claims the state trial court denied his due process right to present a defense by excluding Birch's sisters' testimony. <u>See</u> <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (internal quotation marks omitted)); <u>Chambers</u>, 410 U.S. at 302 ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). According to Taylor, the sisters' proffered testimony that Birch occasionally used or purchased crack would have corroborated his defense that the victim consented to sex on the night in question.

As an initial matter, the State argues, as it did before the district court, that this federal due process claim is procedurally barred because Taylor did not "fairly present" his claim in the state courts. Baldwin v. Reese, 541 U.S. 27, 29 (2004). "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Id. (internal quotation marks and citation omitted). The prisoner must "fairly present" his federal claim in each appropriate state court to provide the State with the requisite opportunity. Id. This can be done by "indicat[ing] the federal law basis for [a] claim in a state-court petition or brief." Id. at 32. In his brief before the Florida Supreme Court on direct appeal, Taylor averred that he was entitled to introduce the victim's sisters' testimony under the Sixth Amendment, and he cited twice to Chambers, 410 U.S. 284. We agree with the district court that Taylor exhausted his federal claim before the appropriate state court. We turn then to the merits.

We begin our analysis with what is by now almost hornbook law; federal courts will not generally review state trial courts' evidentiary determinations. Hall v. Wainwright, 733 F.2d 766, 770 (11th Cir. 1984); see Lisenba v. California, 314 U.S. 219, 228 (1941) ("We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence."). Indeed, in a

19

habeas corpus action brought by a state prisoner, our authority is "severely restricted" in the review of state evidentiary rulings. Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983) (per curiam); see Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Habeas relief is warranted only when the error "so infused the trial with unfairness as to deny due process of law." Lisenba, 314 U.S. at 228; see Estelle, 502 U.S. at 75 (holding that habeas relief was not warranted because neither the introduction of the challenged evidence, nor the jury instruction as to its use, "so infused the trial with unfairness as to deny due process of law"); Bryson v. Alabama, 634 F.2d 862, 864-65 (5th Cir. Unit B Jan. 1981)[2] ("A violation of state evidentiary rules will not in and of itself invoke Section 2254 habeas corpus relief. The violation must be of such a magnitude as to constitute a denial of 'fundamental fairness.'"); cf. Chambers, 410 U.S. at 302 (concluding that the exclusion of "critical evidence" denied the defendant "a trial in accord with traditional and fundamental standards of due process"). The trial court's exclusion

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

of the victim's sisters' proffered testimony does not come close to denying Taylor fundamental fairness.

For starters, we are hard-pressed to find that the trial court even erred in excluding the sisters' testimony, which had no direct bearing on the issue of sexual consent. The proffered testimony consisted of the sisters' statements that the victim purchased or used crack cocaine a few times between one and five-and-a-half months before she died. The trial court sustained the State's objection to the sisters' testimony because the evidence was "irrelevant" to the sexual-consent defense and "remote." The Florida Supreme Court agreed that Taylor failed to show that the sisters' testimony was relevant: "To be relevant, evidence must tend to prove or disprove a fact in issue," and the victim's use or purchase of crack cocaine on a few occasions prior to her death "does not tend to show that she consented to sex with Taylor on the night in question." Taylor, 583 So. 2d at 328. The court explained that none of the excluded witnesses had ever observed the victim offer to sell her body. Id. And the defendant proffered no other evidence demonstrating a correlation between the sporadic use or purchase of crack and engagement in prostitution. Taylor thus failed to establish that an individual who occasionally uses or purchases cocaine would be more likely than a non-user to approach a group of men at 4 a.m. in an alley and offer sexual favors for cash or dope. Id. The court concluded that "[a]bsent a link between the prior cocaine use

21

and sexual activity by the victim, the testimony simply was not probative of whether she consented to sexual activity with Taylor before the fateful beating." Id.

Moreover, even if the evidence was relevant, the state court's evidentiary ruling did not "fatally infect[] the trial" so as to justify habeas relief. Lisenba, 314 U.S. at 236. To render a state-court proceeding fundamentally unfair, the excluded evidence must be "material in the sense of a crucial, critical, highly significant factor." Boykins v. Wainwright, 737 F.2d 1539, 1544 (11th Cir. 1984). On this record, Taylor cannot meet the high bar. The proffered testimony would not have materially supported Taylor's defense because the events the sisters witnessed were too infrequent and far removed in time and location. What's more, each sister in fact testified that she had never seen Birch "offer her body for cocaine." In short, the tie between the proposed testimony and the defense was exceedingly remote and attenuated. In no way did the proffer even remotely suggest that the victim had offered her body for money or drugs that night, or that the sexual encounter was indeed a consensual one. Moreover, Taylor was given a "fair opportunity" to present other critical evidence in support of his defense that the sexual encounter was consensual. Crane, 476 U.S. at 687. He took the stand at trial, asserting that Birch propositioned him with "sexual favors" in exchange for "a five dollar hit and

22

ten dollars," and then presented testimony from two friends, Allen and Mitchell, who corroborated at least a portion of his version of the events.

The Florida Supreme Court's refusal to grant relief based on the exclusion of the sisters' proffered testimony was neither contrary to nor an unreasonable application of clearly established Supreme Court law. None of the cases Taylor cites persuade us otherwise. In Crane v. Kentucky, 476 U.S. 683, the Supreme Court held that a trial court's blanket exclusion of testimony concerning the circumstances of the defendant's confession denied the defendant "his fundamental constitutional right to a fair opportunity to present a defense." Id. at 687, 690. Unlike Crane, however, here the proffered testimony was neither "competent, reliable" evidence "central to the defendant's claim of innocence," nor did it bear on the credibility of a confession. Id. at 690. Nor was Taylor deprived of the opportunity to present a "complete defense." Id. In Chambers v. Mississippi, 410 U.S. 284, the Supreme Court found that the exclusion of corroborative evidence of a third-party's confession, coupled with the refusal to permit the defendant to cross-examine the third-party based on Mississippi's voucher rule, denied the defendant "a trial in accord with traditional and fundamental standards of due process." Id. at 302. This case does not involve the exclusion of highly material evidence as in Chambers. Finally, in Washington v. Texas, 388 U.S. 14 (1967), the Court held that a state statute preventing co-defendants from testifying at each

23

other's trials violated the defendant's Sixth Amendment right to compulsory process. Id. at 23. Again, in contrast to Washington, this case does not implicate an "arbitrary rule[]" preventing a "whole categor[y] of defense witnesses from testifying on the basis of [an] a priori categor[y]" presuming "them unworthy of belief." Id. at 22.

In short, Taylor has not come close to showing that the state court's exclusion of the sisters' testimony rendered his trial "fundamentally unfair." The Florida Supreme Court's resolution of his claim was not contrary to, or an unreasonable application of, clearly established federal law.

B.

Next, Taylor claims trial counsel provided ineffective assistance by calling him to testify without preparation, and then directing him to physically reenact the brutal murder in front of the jury. To succeed on his ineffectiveness claim under Strickland, 466 U.S. at 687, Taylor must establish both deficient performance and prejudice. Strickland's performance prong is satisfied only if the petitioner "show[s] that counsel's representation fell below an objective standard of reasonableness." Id. at 688. The prejudice prong requires the petitioner to establish a "reasonable probability" that, but for counsel's errors, the outcome at trial would have been different. Strickland, 466 U.S. at 694.

The Florida Supreme Court decided not to address whether Taylor established Strickland prejudice, instead determining that counsel's performance was not deficient. We take the same approach, and begin and end our analysis with Strickland's performance prong. See Strickland, 466 U.S. at 697; Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citation omitted)). Based on the facts and circumstances presented, the Florida Supreme Court's determination that counsel did not render deficient performance was not an unreasonable one.

At the postconviction evidentiary hearing, Nick Sinardi, Taylor's guilt-phase trial counsel, testified that he made a reasoned, calibrated decision in calling Taylor to the stand. Taylor had twice confessed in detail to killing Birch; the murderer's identity was never at issue. Sinardi, an experienced attorney, hired a private investigator, carefully reviewed the discovery evidence, and discussed potential defense options with his client. Sinardi's general practice was to focus on one defense theory as opposed to a "shotgun approach" of alternative theories, which he believed could lead to a loss of credibility with the jury. After weighing the alternatives available to the defense, counsel determined the best one was that Taylor committed second-degree murder arising out of consensual sex.

25

Circumscribed by Taylor's two confessions and the trial court's exclusion of other witnesses who could corroborate the sexual-consent defense, Sinardi concluded that taking the stand was in Taylor's best interest. Indeed, there was no other apparent way to establish either that the homicide grew out of consensual sex, or that the murder was the result of a depraved mind. And, ultimately, Taylor agreed and decided to testify.

As for preparation, Sinardi explained that he generally instructs clients that they must be prepared to testify. Sinardi recalled specifically advising Taylor to testify truthfully, and "as to the specifics [about] what he was going to testify to is whatever discussions we . . . had . . . in the past concerning what occurred." But Sinardi did not rehearse Taylor's testimony with him because he did not think this would be effective.

At trial, Sinardi elicited essential testimony from Taylor supporting a second-degree murder theory. Taylor claimed that Birch offered him sexual favors in exchange for cash and dope, and she freely and voluntarily engaged in sexual relations with him in the dugout. Moreover, in describing the murder, Taylor stated he "was upset and angry" and "just acted out of reflexes"; he had "no conscious thought in [his] mind when this was happening."

Since "[t]here are countless ways to provide effective assistance in any given case," Strickland, 466 U.S. at 689, "the range of what might be a reasonable

26

approach at trial must be broad," Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). The Supreme Court has mandated a highly deferential review of counsel's conduct, especially in cases like this one involving strategy. Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994). A petitioner must meet the onerous burden of demonstrating "that no competent counsel would have taken the action that his counsel did take." Chandler, 218 F.3d at 1315 (emphasis added). On this record, Taylor has not come close to making this showing, let alone that the Florida Supreme Court's determination was an unreasonable one. Sinardi's decision to call Taylor to the stand, even without rehearsing the testimony, falls squarely within the "wide range" of performance that is constitutionally acceptable under Strickland, 466 U.S. at 689. See Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

As part of his ineffectiveness claim, Taylor also alleges that counsel acted deficiently by having him reenact the murder scene while on the stand. This argument is meritless. In the first place, contrary to Taylor's characterization of the record in his federal habeas petition and appellate briefs, the trial transcript does not reflect that counsel actually directed Taylor to demonstrate how he choked, kicked, and stomped the victim to death. Counsel did instruct Taylor to do the

following: (1) demonstrate how he sat on the bench in the dugout; (2) remove his sweater so that the jury could view his muscular arms and chest; and (3) show the jury what a "dead lift" exercise is. But there is no indication that counsel asked Taylor to physically reenact the violent homicide, as Taylor now claims. Unlike other instances in the trial transcript, the relevant part of the transcript in which Taylor recounts the murder does not contain any notation, such as the word "indicating," showing that Taylor was physically reenacting the actions he was describing. Nor does any other evidence in the record, including Taylor's testimony, corroborate his allegation that counsel instructed him to physically reenact the murder.[3] Instead, it appears from the record that counsel only solicited a verbal description of the murder from Taylor.

---

[3] Five days after oral argument, on June 10, 2014, Taylor filed a motion to expand the COA to address the issue of the state postconviction court's suppression of Sonya Davis's deposition testimony. Taylor urges us to consider the victim's daughter's testimony, arguing that it supports both his due process and Strickland claims. We deny Taylor's motion to expand the COA because it is both a day late and a dollar short. It is well-settled that "[t]he decision about which issues are to be considered on the merits must be made on the front end of an appeal, before the issues are briefed, argued, and decided on the merits." Hodges v. Attorney Gen., State of Fla., 506 F.3d 1337, 1340 (11th Cir. 2007). On October 16, 2013, this Court denied Taylor's application for a COA on the issue of the state court's refusal to consider Davis's testimony. Because this Court already considered the question of the exclusion of Davis's testimony and concluded that a COA was not warranted in that regard, Taylor's motion to expand the COA really is a motion for reconsideration, which we deny. See Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir. 2007). Taylor has provided no good cause for the untimely filing of this motion. See 11th Cir. R. 27-2 ("A motion to reconsider, vacate, or modify an order must be filed within 21 days of the entry of such order.").

But even if this motion were timely filed, it would still fail on the merits. As the district court found, Taylor's claim relating to Davis's deposition testimony ultimately boils down to a challenge to the process afforded to him in a state postconviction proceeding, and this does not constitute a cognizable claim for habeas relief. See Carroll v. Sec'y, DOC, 574 F.3d 1354, 1365

28

Counsel's strategic decision to have Taylor recount the murder in detail and demonstrate his strength to the jury was not objectively unreasonable. At the postconviction evidentiary hearing, Sinardi testified that Taylor was "very rational," "never antagonistic," and "cooperative"; Sinardi aimed to contrast Taylor's mild-mannered demeanor with his powerful physique to further advance his second-degree murder theory. He wanted the jury to understand how this "gentle giant" could have unintentionally killed the petite victim -- who was about half his size -- upon flying into an uncontrollable rage. As this Court has counseled, "The [deficient performance] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." Waters, 46 F.3d at 1512 (quoting White v. Singletary, 972 F.2d 1218, 1220 (11th Cir. 1992)). A reasonable lawyer surely could have drawn the tactical choices Sinardi made, especially in

(11th Cir. 2009) (reiterating the well-established principle that defects in state collateral proceedings do not provide a basis for habeas relief); Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."). Moreover, and in any event, the substance of Davis's deposition testimony does nothing to buttress either of Taylor's claims on which we granted the COA. Although Davis admitted during her deposition that her mother planned to check herself into a drug rehabilitation center before she was murdered, Davis also unequivocally asserted several times that her mother never worked as a prostitute or offered sex for drugs. And while Davis acknowledged that she was "scared" when she witnessed Taylor's trial testimony, Davis's deposition testimony does not support the claim that defense counsel instructed Taylor to reenact choking and kicking the victim during trial.

light of the profound obstacles created by Taylor's confessions. In short, Taylor

has simply failed to establish that the Florida Supreme Court's determination about

trial counsel's performance was contrary to or an unreasonable application of

Strickland.

Taylor is not entitled to habeas relief on either claim, and accordingly we

affirm the denial of his petition.

**AFFIRMED.**